838 A.2d 566

CITY OF PHILADELPHIA and John F. Street, Individually as a Taxpayer and in his Official Capacity as Mayor of Philadelphia, Petitioners/Appellees,

v.

COMMONWEALTH of Pennsylvania, Edward G. Rendell, in his Official Capacity as Governor of the Commonwealth of Pennsylvania; Robert C. Jubelirer, President Pro Tempore of the Senate of the Commonwealth of Pennsylvania; John M. Perzel, Speaker of the House of Representatives of the Commonwealth of Pennsylvania; Robert J. Mellow, Minority Leader of the Senate of the Commonwealth of Pennsylvania; H. William Deweese, Minority Leader of the House of Representatives of the Commonwealth of Pennsylvania; and Pennsylvania Convention Center Authority, Respondents/Appellants.

Supreme Court of Pennsylvania.

Argued May 14, 2003.

Decided Nov. 7, 2003.

548

John G. Knorr, III, Calvin Royer Koons, for Commonwealth of Pennsylvania and Edward G. Rendell.

Claude Joseph Hafner, James J. Conaboy, Edwin Aksel Abrahamsen, for Robert Mellow.

Linda J. Shorey, John P. Krill, for John M. Perzel.

Michael P. Edmiston, Reizdan B. Moore, Joseph Matthias Cosgrove, for H. William DeWeese.

William R. Thompson, Nelson A. Diaz, Mark R. Zecca, Michael F. Eichert, for City of Philadelphia.

Sean Vincent Burke, David Allen Hitchens, Judith E. Harris, for Pennsylvania Convention Center Authority.

Jennifer R. Clarke, Nelson A. Diaz, Michael F. Eichert, Edward T. Fisher, Robert C. Heim, William R. Thompson, Philip N. Yannella, Mark R. Zecca, for City of Philadelphia and John F. Street.

Carolyn H. Nichols, Alfred W. Putnam, Obra S. Kernodle, Emily Mirsky, for Philadelphia Parking Authority.

Before CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ.

## OPINION

Justice SAYLOR.

This is an appeal from an order of the Commonwealth Court preliminarily enjoining the implementation of an act of the General Assembly which, *inter alia*, reorganized the governance of the Pennsylvania Convention Center. The Court assumed plenary jurisdiction to resolve the underlying facial state constitutional challenge to the procedural regularity of the statute's enactment. The primary issue presented is whether the act violates the Pennsylvania Constitution's single-subject requirement.

### I.

Senate Bill 1100 of 2002 ("SB 1100") was introduced and finally adopted as a bill that would amend Title 53 (Municipal Corporations) of the Pennsylvania Consolidated Statutes. It became Act No. 2002–230 ("Act 230") when then-Governor Mark S. Schweiker signed it into law on December 30, 2002. The statute effects several changes in local governance and related administrative matters. Additionally, it alters the size and composition of the Pennsylvania Convention Center's governing board, as well as the manner in which the Convention Center is governed. Act 230 also repeals a portion of the Pennsylvania Intergovernmental Cooperation Authority

("PICA") Act for Cities of the First Class,[1] and adds Chapter 58 to Title 53, entitled "Contractors' Bonds and Financial Security for Redevelopment Contracts."

The parties entered a Stipulation of Facts (the "Stipulation") delineating the process by which SB 1100 became law. According to that document, as well as the legislative history and the copies of the various versions of the bill included in the record, SB 1100 was initially introduced in the General Assembly in October of 2001. At that time, it was five pages in length and was entitled,

> AN ACT Amending Title 53 (Municipalities Generally) of the Pennsylvania Consolidated Statutes, further providing for governing body of municipal authorities.

Stipulation at ¶ 2; see SB 1100, Printer's No. 1381 at 1.

The only substantive provision contained in this original version of the bill was the inclusion of a citizenship requirement for the board members of business improvement district authorities created pursuant to the Municipality Authorities Act.[2] This entailed the addition of a new paragraph to Section 5610(b), 53 Pa.C.S. § 5610(b), stating:

> Each member of the board of a business improvement district authority that was established by a borough pursuant to the [Municipality Authorities Act], on or before the effective date of this paragraph shall be a taxpayer in, maintain a business in or be a citizen of the borough by which that member is appointed.

SB 1100, Printer's No. 1381 at 3.

After approval by the Senate, the bill was sent to the House of Representatives in December of 2001, where, over the

---

**1.** Act of June 5, 1991, P.L. 9, No. 6 (as amended, 53 P.S. §§ 12720.101–12720.709) (the "PICA Act"). The PICA Act's purpose is to provide a mechanism for cooperation between the Commonwealth and financially distressed cities of the first class (i.e., Philadelphia), so as to foster such cities' fiscal integrity and to assure that they: provide for the health, safety and welfare of their citizens; meet their financial obligations with respect to their lenders, employees, vendors and suppliers; and utilize proper financial planning procedures and budgeting practices. See 53 P.S. § 12720.102.

**2.** Act of May 2, 1945, P.L. 382, No. 164 (as amended, 53 Pa.C.S. §§ 5601–5622).

course of the following seven months, it was amended three times, in each instance by the addition of relatively minor changes. In the first of these amendments, for example, the title was enlarged to include the phrase "and for certain fiscal reporting," several revisions were made to the text quoted above, and the language of Section 5612(b), 53 Pa.C.S. § 5612(b) (relating to the reporting requirements of municipality authorities), was slightly altered. On June 26, 2002, after all of these revisions had occurred, the title of the bill read as follows:

AN ACT Amending Title 53 (Municipalities Generally) of the Pennsylvania Consolidated Statutes, providing for acceptance of gifts or donations; and further providing for governing body of municipal authorities and for certain fiscal reporting.

Stipulation at ¶ 13; see SB 1100, Printer's No. 2157 at 1. The substantive provisions of the bill remained modest and were limited essentially to the matters described above, as well as the addition of a measure authorizing municipalities to hold in trust any gifts bestowed upon them. See SB 1100, Printer's No. 2157 at 9; 53 Pa.C.S. § 1391. By that date, the bill had been passed by both the House and Senate after receiving three considerations. See PA. CONST. art. III, § 4 ("Every bill shall be considered on three different days in each House.").

Thereafter, on October 9, 2002, the bill was reported to the full Senate as committed for concurrence in the House's amendments, but was sent to the Senate Committee on Rules and Executive Nominations ("Senate Rules Committee") before concurrence took place. The committee altered the bill, and reported it back to the full Senate on November 26, 2002—the second-to-last day of the legislative session—for a final vote. As amended, the bill now bore the title:

AN ACT Amending Title 53 (Municipalities Generally) of the Pennsylvania Consolidated Statutes, providing for acceptance of gifts or donations; further providing for powers and duties of the Municipal Police Officers' Education and Training Commission; prohibiting political activity by municipal police officers; further providing, in Parking Author-

ities, for definitions, for purposes and powers and for special provisions for authorities in first class cities; providing, in parking authorities in first class cities, for additional special provisions, for management of authority funds, for special funds, for bonds, for contracts with authority obligees, for Commonwealth pledges, for bond and trust indentures, for funds collected, for bonds as legal investments, for pledge validity, for security interests in funds and accounts and for bankruptcy limitations; further providing for municipal authority governing bodies and money; providing for regulation of taxicabs and limousines in first class cities; further providing for governing body of municipal authorities and for certain fiscal reporting; codifying the Act of June 27, 1986 (P.L. 267, No. 70), known as the Pennsylvania Convention Center Authority Act; defining "expansion or substantial renovation"; further providing for purposes and powers and for capital and operating budgets; providing for expansion funding; further providing for governing board, for moneys of the authority, for award of contracts, for interests of public officers and for rental tax; making an appropriation; and making repeals.

Stipulation at ¶ 19; *see* SB 1100, Printer's No. 2436 at 1.

The changes to the body of the bill, which was now some 127 pages in length, were likewise extensive. These revisions included, among others things: the repeal of Section 209(k) of the PICA Act, which, *inter alia,* had required arbitrators involved in resolving certain collective bargaining disputes to accord substantial weight to Philadelphia's financial plan and its ability to fund any relevant salary increases, and had, additionally, provided for judicial review of such awards; changes to the size and composition of the Pennsylvania Convention Center Authority's governing board, as well as the manner in which the Convention Center is governed;[3] a

---

**3.** The Center was established in 1986 by the Pennsylvania Convention Center Authority Act, *see* Act of June 27, 1986, P.L. 267, No. 70 (as amended 53 P.S. §§ 16201–16224). Under the terms of that statute, the Mayor of Philadelphia appointed two members to the Center's governing board, the City Council of Philadelphia appointed two members, and the Governor appointed four members. *See* 53 P.S. 16211(a).

transfer of authority over taxis and limousines in Philadelphia from the Public Utility Commission to the Philadelphia Parking Authority; a grant of new powers to the Parking Authority to develop mixed-use projects combining public parking facilities with commercial, residential, industrial, and retail components; an expansion of the bonding requirements for small contractors engaged in redevelopment activities within Philadelphia; the curtailment of oversight authority by Philadelphia's Finance Director over spending by the Parking Authority; and a prohibition on police officers participating in election campaigns. The newly-expanded bill was approved by the full Senate on the same day it was reported out of committee, and was passed in the House of Representatives the following day, November 27, 2002, which was the last day of session before adjournment *sine die.* SB 1100 was then approved by the Governor, thus becoming Act 230.

On January 23, 2003, the City of Philadelphia (the "City") and its mayor, the Honorable John F. Street (in his capacity as a city taxpayer and in his official capacity as Mayor) [hereinafter "Petitioners"], filed a petition for review in the Commonwealth Court in the nature of a complaint seeking a declaratory judgment and injunctive relief (the "Complaint"), as well as a motion for a preliminary injunction. In the Complaint, Petitioners asserted that Act 230 will harm the Philadelphia region's economy—in particular, its hospitality industry—as well as the City's reputation and its ability to bargain with its uniformed personnel, and that it will restrict the City's home-rule rights. They averred that the repeal of Section 209(k) of the PICA Act, *see* 53 P.S. § 12720.209(k) (relating to arbitration awards pursuant to the Policemen and Firemen Collective Bargaining Act), was accomplished in a deceptive manner by burying the one-sentence repealer deep within the bill as amended late in the legislative process.

Under Act 230, in addition to the four individuals selected by the Mayor and Council of Philadelphia, the Presiding Officers and Minority Leaders of the General Assembly each appoint a board member, and each county in the Philadelphia metropolitan area (other than Philadelphia County) appoints one of its residents to serve as well. *See* 53 Pa.C.S. § 5911(a).

Petitioners contended generally that the Act was passed using a "speedy" and "stealthy" process that violated the state Constitution. In this regard, Petitioners alleged that,

on November 26 and 27, 2002, along with hundreds of other bills, the General Assembly of the Commonwealth of Pennsylvania was presented, for the first time, with a 127–page bill containing thousands of words, covering scores of subjects and making fundamental changes to institutions operating within the City of Philadelphia and beyond. The title of that bill, itself covering 27 lines of densely-worded text, still was not enough to describe the many changes that followed. Faced with a take-it-or-leave-it situation on the eve of the Thanksgiving holiday, the legislators in both Houses passed the bill on the same day it was given to them.

Complaint at 5. Petitioners asserted causes of action alleging violations of the Pennsylvania Constitution, Article III, Section 1 (original purpose), Section 3 (single subject and title), Section 4 (three readings), and Section 6 (revival and amendment of laws).[4] The respondents—the Commonwealth of Pennsyl-

4. Article III, Section 1 states:
 No law shall be passed except by bill, and no bill shall be so altered or amended, on its passage through either House, as to change its original purpose.
 Article III, Section 3 states:
 No bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or part thereof.
 Article III, Section 4 states:
 Every bill shall be considered on three different days in each House. All amendments made thereto shall be printed for the use of the members before the final vote is taken on the bill and before the final vote is taken, upon written request addressed to the presiding officer of either House by at least 25% of the members elected to that House, any bill shall be read at length in that House. No bill shall become law, unless on its final passage the vote is taken by yeas and nays, the names of the persons voting for and against it are entered on the journal, and a majority of the members elected to each House is recorded thereon as voting in its favor.
 Article III, Section 6 states:
 No law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title only, but so much thereof as is revived, amended, extended or conferred shall be re-enacted and published at length.
 PA. CONST art. III, §§ 1, 3, 4, 6.

vania, Governor Edward G. Rendell, the General Assembly's Presiding Officers (Senate President Robert C. Jubelirer and then-Speaker of the House Matthew J. Ryan [5]), the minority leaders of the Senate (Robert J. Mellow) and House (H. William DeWeese), and the Pennsylvania Convention Center Authority—joined by the Philadelphia Parking Authority as Intervenor (collectively "Respondents"), filed preliminary objections in the nature of a demurrer and a motion to dismiss.

The Commonwealth Court, President Judge Colins presiding, held a hearing on Petitioners' request for a preliminary injunction, at which Mayor Street and PICA Chairman Joseph Vignola testified. Additionally, House Members Babette Josephs and Kathy Manderino provided testimony concerning their confusion or lack of knowledge regarding the content of SB 1100 after it was reported out of the Senate Rules Committee as a 127–page bill on the penultimate day of session. Thereafter, on February 19, 2003, the court filed an unpublished opinion and an accompanying order disposing of the motion. The court opined initially that, while the testimony of the House Members was credible, it could not, consistent with the enrolled bill doctrine, be given any weight. As to the substance of Petitioners' allegations, the court indicated that Article III, Section 3 was designed to prevent abuses related to the practice of passing "omnibus" bills with hundreds of pages of unrelated provisions and little public notice as to their contents. It noted that, while the restrictions contained in Section 3's text do not lend themselves to "bright line" rules, the procedure used in the present case "crossed th[e] line" as to what is acceptable under that provision. The court continued:

> Most of this legislation was concealed from the public until 24 hours prior to its passage. While some commentators have referred to similar types of bills as "stealth legislation" this Court does not wish to use that term as it would impute

**5.** After Speaker Ryan died on March 29, 2003, the Honorable John M. Perzel, present Speaker of the House, was substituted for him as a respondent.

evil motives to the leadership of the General Assembly. The term "24 hour legislation" would seem to be more appropriate. However, it is exactly such "24 hour legislation" that the Constitutional amendments of 1874 were meant to prohibit. Unfortunately, the public had no indication that such radical changes in governance were being contemplated despite the fact that, as noted, the taxpayers will be footing the bill for all this. Pennsylvania is one of the few states that has incorporated, via its constitution, restraints upon the Legislature's ability to propose and pass legislation without public notice. The foregoing scenario is exactly what the framers of the 1875[sic] Constitution meant to prevent.

Commonwealth Ct. op. at 26. Accordingly, the Commonwealth Court determined that Petitioners had established a clear right to relief under Article III, § 3.

The court additionally concluded that the testimony of Mayor Street and Mr. Vignola demonstrated irreparable harm to the City by establishing that the repeal of Section 209(k) of the PICA Act could undermine Philadelphia's five-year financial plan by introducing uncertainty into the ongoing arbitration process relative to the City's firefighters, and that other provisions of Act 230 could harm the City's hospitality industry. Finally, the court found that delaying implementation of the Act would not harm Respondents, and that the public interest favored maintaining the status quo ante pending final resolution of the underlying constitutional claims on the merits. Thus, the Commonwealth Court entered an order preliminarily enjoining implementation of the Act and reconstituting the governing body of the Convention Center Authority as it existed prior to the bill's passage.

The Presiding Officers, the Convention Center Authority, the Commonwealth, Representative DeWeese, and the Philadelphia Parking Authority appealed. Some of these appeals activated the automatic supersedeas provision of Rule 1736(b) of the Pennsylvania Rules of Appellate Procedure, see Pa. R.A.P. 1736(b), which the Commonwealth Court lifted, but this Court reinstated. Preliminary objections were still pending

when, on April 21, 2003, this Court assumed plenary jurisdiction.

Respondents, as appellants, raise several threshold issues challenging the judiciary's ability to resolve this controversy on the merits. They argue initially that Petitioners lack standing to challenge the validity of Act 230. They also contend that, even if jurisdiction is present, the enrolled bill doctrine renders Petitioners' claims non-justiciable. Finally, they claim that the Philadelphia Parking Authority and the PICA Authority are indispensable parties, and that Petitioners' failure to name them as respondents deprived the Commonwealth Court in the first instance—and this Court presently—of subject-matter jurisdiction.

As to the substance of the case, the Presiding Officers and Minority Leader DeWeese argue that during the amendment process, SB 1100 "never wavered" from its initial topic of municipalities generally, and that the bill was only passed after due consideration and "lively debate" in both Houses. The Commonwealth and the Pennsylvania Convention Center Authority add that legislation may be materially altered during the course of its passage without impermissibly changing its purpose, and that this Court has never held otherwise. They maintain that there is no evidence that the Act was "sneak" legislation or that there was actual deception of legislators or anyone else during the bill's consideration and passage through the General Assembly. They also contend that all of the Act's provisions are reasonably reflected in its title, and that all amendments to the bill were germane to its original topic of municipalities. Finally, they state that the repeal of Section 209(k) of the PICA Act did not violate Article III, Section 6, as that constitutional provision does not apply to repeals. Intervenor Philadelphia Parking Authority, for its part, suggests that the present case is not premised upon any genuine concern about a constitutional violation, but reflects an effort by entities who suffered a political defeat in the Legislature to regain the ground they lost through the court system.

Petitioners counter that this case is not solely political, but rather, represents an important test concerning the process by which the laws of this Commonwealth are created. In this regard, Petitioners state that Act 230 was passed in a manner designed to conceal its true effects from all but a "small circle of insiders." They argue that such process deprived the legislators who were required to vote on the bill of the notice they needed to act with circumspection and cast an informed vote, and state further that this procedure was not simply "business as usual" within the General Assembly, but rather, violated fundamental precepts set forth in Article III of the state Constitution. Petitioners maintain that such limitations are designed to ensure open and honest government, and that the Commonwealth Court correctly determined that the voluminous last-minute changes to SB 1100 implicated the concerns that motivated the electorate in 1874 to adopt Article III's procedural restrictions. They contend, moreover, that their specific constitutional claims are meritorious because, while many provisions concerning diverse subjects were included in the bill, there was no single unifying topic encompassing all of them, and additionally, the title of the final version of the bill did not provide reasonable notice as to many of the legislative revisions involved, particularly the repeal of portions of the PICA Act and the expansion of bonding requirements for small contractors engaged in redevelopment projects.

## II.

## A.

### 1. Standing

As noted, Respondents first question whether Petitioners have standing to pursue their claims. They argue that all of the City's alleged injuries are speculative and remote, and that there is little record evidence to support the City's contention that it has suffered any harm. They aver further that, in any event, the City cannot be aggrieved by any change in the governance of the Convention Center Authority because the

latter is an instrumentality of the Commonwealth, not the City. Here, Respondents cite to the Commonwealth Court's decision in *City of Pittsburgh v. Commonwealth*, 112 Pa. Cmwlth. 188, 535 A.2d 680 (1987), for the position that Philadelphia is "merely a creature of the sovereign created for the purpose of carrying out local government functions," Brief of Convention Center Authority at 27, and thus, has no enforceable right to have the appointments to the Convention Center Board continue to be made pursuant to the terms of the prior legislation, *see supra* note 3. Petitioners answer that several provisions of Act 230 have an adverse effect upon the functions, duties, and responsibilities of the City as such. They state that these provisions give standing not only to the City, but to Mayor Street as well, both in his official capacity as mayor and in his individual capacity as a taxpayer, since some of the changes will require the City to underwrite new expenditures from general tax revenues.[6]

The requirement of standing under Pennsylvania law is prudential in nature, and stems from the principle that judicial intervention is appropriate only where the underlying controversy is real and concrete, rather than abstract. *See In re Hickson*, 573 Pa. 127, 135–36, 821 A.2d 1238, 1243 (2003). This principle is reflected in the doctrine's core conception that a party who is not negatively affected by the matter he

---

**6.** They assert, for example, that: with the repeal of Section 209(k) of the PICA Act, the City cannot estimate its future obligations relative to its uniformed personnel, which in turn hinders its development of a financial plan through which it could receive Commonwealth funds as a distressed first-class city; the City has lost control over Convention Center expenditures that it is required to fund via tax revenues; the changes effected by Act 230 damage the Convention Center's reputation, which in turn will adversely affect the City's hospitality sector; the change in Convention Center management jeopardizes the collective bargaining process currently ongoing with the unions whose members perform work at the center—and any harm to the Convention Center is harm to the City because the two are economically intertwined; the grant of new powers to the Parking Authority will reduce that entity's excess revenues which would otherwise flow into city coffers; the expansion of bonding requirements for small contractors will thwart the progress of minority-owned companies performing redevelopment projects in the City's blighted neighborhoods; and all of these changes undermine the City's reputation as a desirable place to live and work. *See* Brief at 7–12.

seeks to challenge is not aggrieved, and thus, has no right to obtain judicial resolution of his challenge. *See Pennsylvania Game Comm'n v. Department of Envtl. Res.*, 521 Pa. 121, 127, 555 A.2d 812, 815 (1989); *see also Zemprelli v. Daniels*, 496 Pa. 247, 253, 436 A.2d 1165, 1168 (1981) (concluding that standing existed because the plaintiffs had " 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions' " (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962))). "A litigant can establish that he has been 'aggrieved' if he can show that he has a substantial, direct and immediate interest in the outcome of the litigation. . . ." *In re Hickson*, 573 Pa. at 136, 821 A.2d at 1243. *See generally Wm. Penn Parking Garage v. City of Pittsburgh*, 464 Pa. 168, 346 A.2d 269 (1975). A party has a substantial interest in the outcome of litigation if his interest exceeds that of all citizens in procuring obedience to the law. *See Wm. Penn Parking Garage*, 464 Pa. at 195, 346 A.2d at 282.[7] The interest is direct if there is a causal connection between the asserted violation and the harm complained of; it is immediate if that causal connection is not remote or speculative. *See Kuropatwa v. State Farm Ins. Co.*, 554 Pa. 456, 461, 721 A.2d 1067, 1069 (1998); *Allegheny County v. Monzo*, 509 Pa. 26, 34, 500 A.2d 1096, 1100 (1985). Thus, the fact that a party may be affected in a general way does not alone give him standing. *See Wm. Penn Parking Garage*, 464 Pa. at 197, 346 A.2d at 283. *See generally Sedat, Inc. v. Commonwealth, Dep't of Envtl. Res.*, 165 Pa.Cmwlth. 431, 436, 645 A.2d 407, 410 (1994).

■ For reasons discussed *infra*, all Pennsylvania citizens have a general interest in ensuring that, when the General Assembly enacts legislation, it does so in conformance with the restrictions contained in Article III of the state Constitution. Here, however, Petitioners' complaints stem from aspects of the bill under review that have particular application to Phila-

7. Here, the "law" in question consists of the state constitutional provisions under which Petitioners have brought their challenge.

delphia. Therefore, Petitioners' interest in the outcome of the litigation is substantial, as it surpasses that of Pennsylvania citizens generally in procuring obedience to the law. Furthermore, as all of the changes complained of flow from the enactment of Act 230, a causal connection exists between the asserted constitutional violation and the alleged harm. Thus, the City's interest in this litigation is direct.

The issue, then, reduces to whether that interest is sufficiently immediate to create standing. As discussed, Respondents argue that standing is absent because all of the harms that Petitioners have asserted are remote and speculative, and Petitioners have not provided any factual support for its claims of injury. Certainly, allegations that the Act will hurt the City's reputation, or that bookings at the Convention Center might decrease due to uncertainty as to whether an agreement will be reached with various labor unions, are indirect, remote and speculative. We are not aware of any Pennsylvania authority that supports the position that such abstract or uncertain harms are sufficient to confer standing. Moreover, there is nothing in the record tending to prove that bookings at the Convention Center will suffer, or have suffered, as a result of changes in the Convention Center's governing board.

Other concerns, however, are not as easily dismissed. For example, at the preliminary injunction hearing, Mr. Vignola provided credited testimony that Act 230's repeal of Section 209(k) of the PICA Act will significantly interfere with PICA's ability to perform its obligations under the cooperation agreement in existence between PICA and the City, because future City costs will no longer be subject to reliable estimation or control. The reason is that Section 209(k) required labor arbitrators to take into account the City's existing five-year plan and its ability to pay for requested increases in salary and benefits for the City's police officers and firefighters, *see* 53 P.S. § 12720.209(k)(1)-(2) (repealed), and these items comprise expenditures of $850,000,000, or over a quarter of the City's annual operating budget. According to Mr. Vignola, with Section 209(k) no longer in effect, PICA will be unable to

approve the City's five-year plan, which will in turn cause PICA to withhold monetary grants and loans to the City. *See* 53 P.S. §§ 12720.208–12720.210. The repeal of Section 209(k) also removes the City's right to obtain judicial review of any award granted to its uniformed personnel, and specifically, review of whether the City's financial plan and its ability to pay for the cost increases were adequately considered. *See* 53 P.S. § 12720.209(k)(3) (repealed). These repealed provisions were of substantial benefit to the City in its efforts to develop an approved financial plan, maintain its fiscal stability, and receive assistance from PICA. While Respondents contend that there is no record evidence that the loss of these rights will impose any immediate harm upon the City, the rights are valuable in themselves as they assure an arbitration and judicial review process that is objectively helpful to the City in controlling costs and receiving monetary assistance; thus, the City's loss of such rights via Act 230 constitutes immediate harm.

Additionally, Mayor Street provided credited testimony that many small contractors with limited credit or cash reserves perform valuable redevelopment work within Philadelphia in conjunction with the City's Redevelopment Authority, including urban renewal projects aimed at revitalizing blighted neighborhoods. Under Act 230, whenever the contact amount exceeds $10,000, such businesses are subject to a bonding requirement of 200% of the value of the contract. *See* Act 230, § 7; 53 Pa.C.S. § 5804(a). According to the Mayor, the City is involved in implementing a large-scale neighborhood transformation effort which depends upon small contractors to bid for and perform much of the work involved, and the 200% bonding requirement will interfere with this effort by effectively disqualifying a number of small contractors with whom the City could otherwise conduct business. We thus conclude that the City's interest in having its small-scale contractors remain free of the 200% bonding requirement is sufficiently immediate to confer standing upon the City.

To the extent Respondents rely upon *City of Pittsburgh* for a contrary position, such reliance is misplaced. In that mat-

ter, the Commonwealth Court indicated that, as a municipality created solely to carry out local governmental functions, Pittsburgh lacked standing to assert that the statute challenged there imposed an unequal tax burden upon its residents. The court reasoned that, as the residents of the municipality were the ones allegedly burdened by the statute, they were the proper parties to challenge the law, particularly as there was no allegation that the city's local governmental functions were affected by the statute. *See id.* at 191–92, 535 A.2d at 682. Here, by contrast, Petitioners contend not only that the City's residents will be subjected to an enhanced tax burden, but that the Act affects city governmental functions relative to collective bargaining, budget management, and urban renewal. Therefore, the City's present assertion that it is an aggrieved party is premised upon the effects of Act 230 upon its interests and functions as a governing entity, and not merely upon harm to its citizens individually. Accordingly, we hold that the City's interests, as delineated above, are sufficient to provide the City with standing to bring the present action. *Cf. Franklin Township v. Commonwealth, Dep't of Envtl. Res.*, 500 Pa. 1, 11, 452 A.2d 718, 723 (1982) (concluding that a township had standing to contest the grant of a permit for solid waste disposal within its boundaries, as the grant implicated the township's responsibility to protect the quality of life of its citizens).[8]

### 2. Enrolled Bill Doctrine

Next, several Respondents maintain that the present dispute is non-justiciable under the enrolled bill doctrine. In essence, they contend that, because SB 1100 has become law and is on file with the Secretary of the Commonwealth, it is presumed to have been legally adopted, and thus, the judiciary may not "go behind its face to determine whether the procedural requirements of the Constitution were followed." Brief of Presiding Officers at 14 (citing *Kilgore v. Magee*, 85 Pa. 401, 412 (1877)). Respondents' concern appears to stem from the

---

**8.** Because of our conclusion that the City has standing, we need not consider whether Mayor Street also has standing.

introduction the testimony of two Members of the House of Representatives at the preliminary injunction hearing. These Members testified that, during the hectic last hours of session, many bills were voted upon in rapid sequence and there was insufficient time to become familiar with the content of SB 1100 in its final, lengthy, form as it emerged from committee, thus making it impossible for them to cast an informed vote.

An enrolled bill is one which has been certified by the Speaker of the House and the presiding officer of the Senate as having passed the General Assembly, and has been signed by the Governor and lodged with the Secretary of the Commonwealth. *See Pennsylvania Sch. Bds. Ass'n v. Commonwealth Ass'n of Sch. Adm'rs,* 569 Pa. 436, 453 n. 14, 805 A.2d 476, 486 n. 14 (2002); ROBERT E. WOODSIDE, PENNSYLVANIA CONSTITUTIONAL LAW 348 (1985). In keeping with the strong presumption of validity enjoyed by all duly enacted legislation, *see Harrisburg Sch. Dist. v. Zogby,* 574 Pa. 121, 134–36, 828 A.2d 1079, 1087 (2003), as well as the need to preserve "the delicate balance critical to a proper functioning of a tripartite system of government," *Consumer Party of Pa. v. Commonwealth,* 510 Pa. 158, 176, 507 A.2d 323, 332 (1986), this Court has exercised restraint when asked to invalidate legislation, particularly where to do so could "intru[de] upon the prerogatives of a sister branch of government." *Id.* at 176–77, 507 A.2d at 332. One aspect of such restraint has been the principle, embodied in the enrolled bill doctrine, that, once a statute is attested by the presiding officers of the Legislature, approved by the Governor, and officially lodged, it is presumed to have been enacted in the manner required by law.

As Act 230 is now an enrolled bill, we agree that the subjective, individualized motivations or impressions of specific legislators would not be an appropriate basis upon which to rest a determination as to its validity. Although the concerns expressed by the Members are not unfounded, taking such testimony into account would be "going behind" the statute as enacted and inappropriately delving into the mental processes of the legislators who voted on it. The same cannot be said,

however, concerning review of constitutional compliance predicated upon the title and content of the bill as enrolled,[9] or of the judicially noticeable legislative history. In this latter respect—that is, with regard to a bill's history—we note that, while this Court did for many years adhere to a strict doctrine preventing it from considering matters of form in the passage of legislation, see *Kilgore*, 85 Pa. at 412 (stating that, "when a law has been passed and approved and certified in due form, it is no part of the duty of the judiciary to go behind the law as duly certified to inquire into the observance of form in its passage"); *Mikell v. School Dist. of Phila.*, 359 Pa. 113, 123–27, 58 A.2d 339, 344–46 (1948); *Perkins v. City of Phila.*, 156 Pa. 554, 568, 27 A. 356, 362 (1893); WOODSIDE, PA. CONSTITUTIONAL LAW, at 348 ("The courts will not go back of the signatures of [the presiding officers and the Governor] to determine whether the bill was enacted in compliance with the constitutional requirements."), this rule has been modified in recent years so that the appropriateness of judicial abstention now depends upon the situation presented. *See generally Pennsylvania Sch. Bds. Ass'n*, 569 Pa. at 454, 805 A.2d at 486–87; *Consumer Party*, 510 Pa. at 177, 507 A.2d at 333; David B. Snyder, Note, *The Rise and Fall of the Enrolled Bill Doctrine in Pennsylvania*, 60 TEMPLE L.Q. 315, 326 (1986). In *Consumer Party*, most notably, this Court explained that, although the need to exercise restraint in deference to a co-equal branch of government often militates in favor of abstention, "[t]he countervailing concern is our mandate to insure that government functions within the bounds of constitutional prescription." *Consumer Party*, 510 Pa. at 177, 507 A.2d at 333. The Court stated:

> We may not abdicate this responsibility under the guise of our deference to a co-equal branch of government. While it is appropriate to give due deference to a co-equal branch of government as long as it is functioning within constitutional

9. Indeed, the Presiding Officers concede that the enrolled bill doctrine would not preclude a merits resolution of an Article III, Section 3 challenge, as the only evidence necessary is the enrolled bill itself. *See* Brief of Presiding Officers at 15 n. 8.

constraints, it would be a serious dereliction on our part to deliberately ignore a clear constitutional violation.

\* \* \* \* \*

We agree with the Attorney General that we must not inquire into every allegation of procedural impropriety in the passage of legislation. However, where the facts are agreed upon and the question presented is whether or not a violation of a mandatory constitutional provision has occurred, it is not only appropriate to provide judicial intervention, and if warranted a judicial remedy, we are mandated to do no less.

*Id.* at 177–78, 180, 507 A.2d at 333–34. As in *Consumer Party,* the parties here have agreed upon the relevant facts,[10] and the constitutional provisions that form the basis of Petitioners' challenge are mandatory. *See, e.g., In re Condemnation by Commonwealth, Dep't of Transp.,* 511 Pa. 620, 625–26, 515 A.2d 899, 901–02 (1986) (indicating that Article III, Section 3 is mandatory in nature); *Common Cause/Pennsylvania v. Commonwealth,* 710 A.2d 108, 117 (Pa.Cmwlth.1998) (same), *aff'd per curiam,* 562 Pa. 632, 757 A.2d 367 (2000). *See generally Consumer Party,* 510 Pa. at 179–80, 507 A.2d at 333–34 (explaining that, "[w]hen the Constitution clearly sets forth the manner in which something shall be done, that procedure must be followed to the exclusion of all others . . .," and holding that Article III, Section 1 is mandatory). Therefore, we agree with the Commonwealth Court's conclusion that the enrolled bill doctrine does not preclude judicial review the merits of the constitutional claims presented here.

### 3. Indispensable Parties

As a final threshold issue, Respondents maintain that the Court lacks jurisdiction because not all indispensable parties have been joined. Here, Respondents propose a wide array of parties that they claim should have been named as additional

10. Petitioners did not sign the Stipulation, but stated at the preliminary injunction hearing that they agreed with all of the facts recited in it. All other parties signed the Stipulation.

respondents, including: the new Convention Center Authority board members, the four counties with new appointment powers relative to the Convention Center Authority, the Public Utility Commission, PICA and all of its bondholders, and the City's firefighters' and police officers' unions. *See* Brief of Presiding Officers at 12–13. In essence, Respondents appear to contend that anyone whose interests may be affected by any aspect of the challenged legislation must be formally joined for jurisdiction to lie.

This Court has stated that a party is indispensable "when his or her rights are so connected with the claims of the litigants that no decree can be made without impairing those rights." *Sprague v. Casey,* 520 Pa. 38, 48, 550 A.2d 184, 189 (1988). "[T]he basic inquiry in determining whether a party is indispensable concerns whether justice can be done in the absence of" him or her. *CRY, Inc. v. Mill Serv., Inc.,* 536 Pa. 462, 469, 640 A.2d 372, 375 (1994). In undertaking this inquiry, the nature of the claim and the relief sought must be considered. *See id.* at 469, 640 A.2d at 375–76.[11] Furthermore, we note the general principle that, in an action for declaratory judgment, all persons having an interest that would be affected by the declaratory relief sought ordinarily must be made parties to the action. *See Mains v. Fulton,* 423 Pa. 520, 523, 224 A.2d 195, 196 (1966). Indeed, Section 7540(a) of the Judicial Code, 42 Pa.C.S. § 7540(a), which is part of Pennsylvania's Declaratory Judgments Act,[12] states that, "[w]hen declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding."

11. The relevant analysis is sometimes said to require examination of the following factors: "1. Do absent parties have a right or interest related to the claim? 2. If so, what is the nature of that right or interest? 3. Is that right or interest essential to the merits of the issue? 4. Can justice be afforded without violating the due process rights of absent parties?" *Mechanicsburg Area Sch. Dist. v. Kline,* 494 Pa. 476, 481, 431 A.2d 953, 956 (1981). These are implicitly considered in the analysis that follows.

12. Act of July 9, 1976, P.L. 586, No. 142, § 2 (as amended, 42 Pa.C.S. §§ 7531–7541).

568

■■■■■ While this joinder provision is mandatory, it is subject to limiting principles. For example, where the interest involved is indirect or incidental, joinder may not be required. *See, e.g., Mid–Centre County Auth. v. Township of Boggs,* 34 Pa.Cmwlth. 494, 501, 384 A.2d 1008, 1012 (1978) (concluding that Pennsylvania's Department of Environmental Resources was not an necessary party to a declaratory judgment action where its sole interest in the dispute concerned the identity of the party who would be responsible for complying with its regulations). *See generally Columbia Gas Transmission Corp. v. Diamond Fuel Co.,* 464 Pa. 377, 379, 346 A.2d 788, 789 (1975) (defining an indispensable party as "one whose rights are so directly connected with and affected by litigation that he must be a party of record to protect such rights"). Additionally, where a person's official designee is already a party, the participation of such designee may alone be sufficient, as the interests of the two are identical, and thus, the participation of both would result in duplicative filings. *See generally Leonard v. Thornburgh,* 78 Pa.Cmwlth. 216, 218, 467 A.2d 104, 105 (1983) (*en banc*) (holding that the Governor need not participate in litigation involving a constitutional attack upon a tax statute, where his designee, the Secretary of the Department of Revenue, adequately represented his interests).

■■■■■ The present case exemplifies another basis for construing Section 7540(a) of the Declaratory Judgments Act subject to reasonable limitations: if that provision were applied in an overly literal manner in the context of constitutional challenges to legislative enactments containing a wide range of topics that potentially affect many classes of citizens, institutions, organizations, and corporations, such lawsuits could sweep in hundreds of parties and render the litigation unmanageable. It is true that all such parties would be affected, at least incidentally, by a declaration that the statute in question is unconstitutional. Here, for example, a declaration invalidating Act 230 would have some effect upon: all police officers within the Commonwealth; various entities affected by the new powers conferred upon the Parking Authority; individu-

als and corporations associated with the taxi or limousine industries; redevelopment authorities throughout the Commonwealth, as well as the many contractors hired or potentially hired by such authorities; arbitrators involved in arbitration related to Philadelphia police and firefighters; and many more. However, requiring the joinder of all such parties would undermine the litigation process. The Wisconsin Supreme Court recognized this difficulty when construing language identical to that contained in Pennsylvania's Declaratory Judgments Act in the context of a facial constitutional challenge to a local ordinance.[13] That court indicated:

> We do not construe the statute as requiring that where a declaratory judgment as to the validity of a statue or ordinance is sought, every person whose interests are affected by the statute or ordinance must be made a party to the action. If it were so construed, the valuable remedy of declaratory judgment would be rendered impractical and indeed often worthless for determining the validity of legislative enactments, either state or local, since such enactments commonly affect the interests of large numbers of people.

*Town of Blooming Grove v. City of Madison,* 275 Wis. 328, 81 N.W.2d 713, 717 (1957) (citing *White House Milk Co. v. Thomson,* 275 Wis. 243, 81 N.W.2d 725, (1957)). *White House Milk Co.* involved a similar question within the context of a facial constitutional challenge to a state enactment. After expressing sentiments similar to those quoted above, the court concluded:

> Therefore, we construe [the relevant section of the Uniform Declaratory Judgments Act] as not requiring the joinder as parties, in a declaratory action to determine the validity of a statute or ordinance, of any persons other than the public

13. The present Declaratory Judgments Act replaced and recodified Pennsylvania's prior act, which was derived from the Uniform Declaratory Judgments Act. *See* Act of June 18, 1923, P.L. 840 (as amended, 12 P.S. §§ 831–846) (repealed). The relevant provision pertaining to necessary parties—which is also reflected in the Wisconsin statute—remained the same. *See* Uniform Declaratory Judgments Act, § 11 (Parties).

officers charged with the enforcement of the challenged statute or ordinance. Such defendant public officers act in a representative capacity in behalf of all persons having an interest in upholding the validity of the statute or ordinance under attack.

*White House Milk Co.,* 81 N.W.2d at 729. *Accord North Side Bank v. Gentile,* 129 Wis.2d 208, 385 N.W.2d 133, 136 (1986).

We agree with the Wisconsin Supreme Court that requiring the participation of all parties having any interest which could potentially be affected by the invalidation of a statute would be impractical, for the reasons stated. Further, as such an interpretation would result in an unwieldy judicial resolution process, it would run contrary to the Legislature's direction, as expressed in the text of the Declaratory Judgments Act, that the statute constitutes remedial legislation to be construed liberally so as to settle, and afford relief from, uncertainty relative to rights, status, and other legal relations. *See* 42 Pa.C.S. § 7541(a); *see also* 1 Pa.C.S. § 1922(1) (providing that the General Assembly does not intend a result which is unreasonable or incapable of execution).

The question remains, however, whether Petitioners have joined all necessary parties under the circumstances of the present matter. In answering, we note initially that, in Pennsylvania, the Attorney General is the Commonwealth official statutorily charged with defending the constitutionality of all enactments passed by the General Assembly, *see* 71 P.S. § 732–204(3) ("It shall be the duty of the Attorney General to uphold and defend the constitutionality of all statutes . . . ."), regardless of the nature of the constitutional challenge or the opinion of any other state official concerning a given statute's validity.[14] As this is a facial constitutional attack upon an act of the General Assembly, the Attorney General stands in a representative capacity for, at a minimum, all non-Common-

14. *See also* Pa.R.C.P. 235 (providing for mandatory notice to the Attorney General in any proceeding challenging the constitutionality of an Act of the General Assembly); Pa.R.A.P. 521 (requiring notice to the Attorney General if the constitutionality of a statute is challenged on appeal).

wealth parties having an interest in seeing the statute upheld.[15] *Cf. Brown v. Butterworth,* 831 So.2d 683, 689–90 & n. 9 (Fla.Dist.Ct.App.2002) (deeming the Attorney General of Florida the only indispensable party to an action challenging the constitutionality of Florida legislation).[16] It is therefore significant that the Commonwealth and the Governor, both of whom are represented here by the Attorney General, are parties to this lawsuit. Still, it bears noting that this case is somewhat unusual in that the crux of the challenge centers, not upon any substantive aspect of the legislation at issue, but upon the procedure by which it was adopted. It could reason-

**15.** This Court recently entered *per curiam* order in *City of Phila. v. Philadelphia Parking Auth.,* 568 Pa. 430, 798 A.2d 161 (2002), a dispute in which the City challenged the validity of a statute granting the Governor of Pennsylvania authority to appoint a majority the Philadelphia Parking Authority's board members. While the order in question directed the Commonwealth Court to resolve the underlying constitutional challenge on the merits, *see id.* at 431, 798 A.2d at 162, several Justices of this Court filed accompanying statements addressing, *inter alia,* whether the Governor was an indispensable party to the litigation. All referred to the *CRY/Kline* standard, but with varying results. Mr. Justice Castille, joined by Mr. Justice Nigro, opined that the Governor was indeed a necessary party, in part because his appointment powers under the challenged legislation were the *"sine qua non"* of the dispute. *See id.* at 434, 798 A.2d at 164 (Castille, J., concurring). This author, by contrast, suggested that the Governor was not indispensable to the litigation because, once he had exercised his appointment powers, he maintained no further direct role in the implementation of the statute, thus rendering his interests insufficiently immediate and direct. *See id.* at 447–48, 798 A.2d at 172 (Saylor, J., concurring). Chief Justice Zappala, joined by then-Justice Cappy, now Chief Justice, stated that the Governor's appointive powers were not essential to a disposition of the substantive issues on the merits, and indicated that the "sheer number of gubernatorial appointments" made pursuant to Pennsylvania statutes and administrative regulations would render troublesome any holding that the Governor was indispensable. *See id.* at 467– 68, 798 A.2d at 184 (Zappala, C.J., dissenting). In the present case, the Governor was made a party, and thus, we need not decide whether his participation is affirmatively required. Moreover, as none of the persons that Respondents claim are indispensable are Commonwealth parties, the disagreement reflected in *Philadelphia Parking Auth.* is not implicated here.

**16.** While Florida's declaratory judgment statute provides that parties with a claim or interest "may," rather than "shall," be made parties, it goes on to state, similar to Pennsylvania's, that "[n]o declaration shall prejudice the rights of persons not parties to the proceedings." FLA. STAT. § 86.091.

ably be argued, then, that the Legislature's participation is necessary, as it has a general interest in defending the procedural regularity of the bills that it approves. Here again, however, the Presiding Officers and the Minority Leaders of both Houses of the General Assembly are named respondents; these officials are capable of representing the interests of the Legislature as a whole.

As discussed, the guiding inquiry in any discussion of indispensability is whether justice can be done in the absence of the parties asserted to be necessary. Such an inquiry entails an assessment of the particular facts and circumstances presented in each case. Here, while it is true that the Act purports to alter the rights and obligations of numerous persons, due to the nature of the constitutional issues raised in the Complaint, achieving justice is not dependent upon the participation of all of those persons.[17] Under the circumstances presented, where there is a facial constitutional challenge based upon Article III's provisions relating to the form of passage of bills, we believe that substantial justice can be done without joining any parties other than those who are presently participating in the litigation. Accordingly, Petitioners' failure to join PICA or any other entity potentially affected by the implementation of Act 230 does not deprive this Court of jurisdiction to determine the merits of their claims.

### B.

Having determined that this Court has jurisdiction to determine Petitioners' claims on the merits, we proceed to a consideration of those issues.

### 1. *Article III, Section 3 challenges*

■ Counts I and II of the Complaint center on the twin requirements of Article III, Section 3, that each bill have only one subject, and that the subject be clearly expressed in the

---

17. As noted, however, the effects of the Act's provisions are relevant to a determination of whether Petitioners have standing.

title. In these claims Petitioners allege that the expansion of SB 1100 by the Senate Rules Committee to include a myriad of subjects having little relationship to one another constitutes a violation of the single-subject rule. They allege further that the title of the final version of the bill failed to refer to large substantive changes contained in the body of that version, including the repeal of a portion of the PICA Act and the addition of a new chapter to the Pennsylvania Consolidated Statutes, namely, Chapter 58, relating to contractors' bonds and financial security for redevelopment contracts. Petitioners contend that these failures in form and procedure deprived the public of adequate notice to participate in the legislative process, and the legislators of the opportunity to vote with circumspection. Respondents generally deny these allegations and argue that Act 230's single subject is municipalities, that all of its provisions relate to this topic, and that the changes wrought by the bill are sufficiently reflected in its title. They point out that many sub-topics may be included in a bill, so long as they are all germane to a single general topic. We note at the outset that, as previously stated, an Act of the Assembly is presumptively valid; it will only be declared void if it violates the Constitution "clearly, palpably and plainly." *Commonwealth, Dep't of Transp. v. McCafferty,* 563 Pa. 146, 155, 758 A.2d 1155, 1160 (2000).

Article III's general purpose is "to place restraints on the legislative process and encourage an open, deliberative and accountable government." *Pennsylvania AFL–CIO ex rel. George v. Commonwealth,* 563 Pa. 108, 119, 757 A.2d 917, 923 (2000). This Article was included in the Pennsylvania Constitution of 1874, which "was drafted in an atmosphere of extreme distrust of the legislative body and of fear of the growing power of corporations, especially the great railroad corporations. It was the product of a convention whose prevailing mood was one of reform...." R. Branning, Pennsylvania Constitutional Development 56 (1960) (quoted in *Consumer Party,* 510 Pa. at 178, 507 A.2d at 333); *see also* Snyder, *Rise and Fall of the Enrolled Bill Doctrine,* at 321 (stating that the 1874 Constitution has been referred to as the

"Reform Constitution"). Although Section 3's single-subject and clear-expression requirements were originally added to the Constitution by amendment in 1864, *see Rogers v. Manufacturers' Imp. Co.*, 109 Pa. 109, 110, 1 A. 344, 344 (1885), their inclusion in the 1874 Constitution was consistent with the electorate's overall goal of curtailing legislative practices that it viewed with suspicion. *See* WOODSIDE, PA. CONSTITUTIONAL LAW, at 295 ("The General Assembly and its enactment of laws was substantially changed in the Constitution of 1874.... Most of the evils which existed in the General Assembly of Pennsylvania and in the Congress of the United States were examined with the idea of correcting them in the new Constitution. The result is found in the required method of enacting legislation contained in Article III."). Moreover, as these mandates survived the more recent constitutional revisions, they "continue to reflect important policies relating to the nature of the deliberative process." Robert F. Williams, *State Constitutional Limits on Legislative Procedure: Legislative Compliance and Judicial Enforcement*, 48 U. PITT. L.REV. 797, 800 (1987).

Section 3's restrictions serve a variety of ends. One is "to curb the practice of incorporating into one bill a variety of distinct and independent subjects of legislation and intentionally disguising the real purpose of the bill by a misleading title or by the comprehensive phrase 'and for other purposes.'" Charles W. Rubendall II, *The Constitution and the Consolidated Statutes*, 80 DICK. L.REV. 118, 120 (1975). Such omnibus bills, as they were then known, permitted the passage of hidden legislation and allowed "logrolling"—that is, "embracing in one bill several distinct matters, none of which could singly obtain the assent of the legislature, and procuring its passage by combining the minorities who favored the individual matters to form a majority that would adopt them all." *Id.* As a corollary, the single-subject requirement prevents the attachment of riders which could not become law on their own to popular bills that are certain to pass. *See generally DeWeese v. Weaver*, 824 A.2d 364, 369 (Pa.Cmwlth. 2003). Also, a bill addressing a single topic is more likely to

obtain a considered review than one addressing many subjects. *See id.* (citing Millard H. Ruud, *No Law Shall Embrace More Than One Subject*, 42 MINN. L.REV. 389, 391 (1958)).[18]

 In practice, Section 3's dual requirements—clear expression and single subject—are interrelated, as they both act to proscribe inserting measures into bills without providing fair notice to the public and to legislators of the existence of the same. *See Rogers*, 109 Pa. at 112, 1 A. at 346 (striking down an act whose title appeared designed to prevent popular opposition to the bill by concealing its true effects); *Pennsylvania State Lodge v. Commonwealth*, 692 A.2d 609, 615 (Pa. Cmwlth.1997) (relating that the purpose of Section 3 is to provide public notice of all proposed legislative enactments and to prevent the passage of "sneak" legislation). On the other hand, bills are frequently amended as they pass through the Legislature, and not all additions of new material are improper. Rather, the strictures of Article III, Section 3 are often satisfied where the provisions added during the legislative process assist in carrying out a bill's main objective or are otherwise "germane" to the bill's subject as reflected in its title. *See L.J.W. Realty Corp. v. City of Phila.*, 390 Pa. 197, 206 n. 8, 134 A.2d 878, 883 n. 8 (1957); *Mallinger v. City of Pittsburgh*, 316 Pa. 257, 261, 175 A. 525, 526 (1934).

In the early part of the Twentieth Century, this Court applied the "germaneness" test in a fairly strict manner. In *Commonwealth ex rel. Woodruff v. Humphrey*, 288 Pa. 280, 291, 136 A. 213, 217 (1927), for example, the Court concluded that a bill regulating land surveyors and "professional engineers" contained two subjects because, although both professions were regulable, they were not the same profession. The Court stated that if the bill had simply defined the term

18. It has been suggested that an additional benefit of the single-subject mandate is to protect the integrity of the Governor's veto power, which, except in the case of appropriation bills, *see* PA CONST. art. IV, § 16, may only be employed to disapprove bills in their entirety. Thus, if the Governor wishes to prevent portions of a bill from becoming law, he must veto the entire statute although it may contain other provisions that he favors. *See* Williams, *State Constitutional Limits on Legislative Procedure*, at 809. This would also be true, although to a lesser degree, with single-subject legislation.

"professional engineer" broadly to include land surveyors, a different result would have obtained. *See id.* Similarly, in *Yardley Mills Co. v. Bogardus,* 321 Pa. 581, 185 A. 218 (1936), this Court considered an Article III, Section 3 challenge to legislation containing three separate provisions, all pertaining to water canals in the Commonwealth: the first relieved canal companies of the obligation to maintain waterways obtained from the Commonwealth; the second granted such companies the right to sell the water for commercial purposes; and the third authorized the Commonwealth to acquire canal lands by gift and to sell portions of them. Although all of these measures pertained to the subject of water canals, this Court concluded that the three provisions were not sufficiently germane to one another to survive scrutiny under the single-subject test. *See id.* at 589, 185 A. at 221; *cf. Rogers,* 109 Pa. at 112, 1 A. at 346 (invalidating a bill entitled, "An act to incorporate the Manufacturers' Improvement Company," in part because its conferral of timber severance and waterway rights was deemed non-germane to the subject of manufacturing). *But cf. Commonwealth ex rel. Bell v. Powell,* 249 Pa. 144, 94 A. 746 (1915) (upholding a statute regulating motor vehicles, although one section of the act merely provided for disposition of the funds derived from license and registration fees; such disposition was said to follow naturally from the fee-collection provision).

In more recent decisions, however, and despite the continued strong public policy underlying the single-subject requirement, some Pennsylvania courts have become extremely deferential toward the General Assembly in Section III challenges. As Respondents suggest, they have tended to apply the single-subject standard to validate legislation containing many different topics so long as those topics can reasonably be viewed as falling under one broad subject. While this trend is consistent in principle with some early pronouncements of this Court, *see, e.g., Kotch v. Middle Coal Field Poor Dist.,* 329 Pa. 390, 399, 197 A. 334, 339 (1938) ("Plurality of subjects is not objectionable so long as they are reasonably germane to each other."), it has resulted in a situation where germaneness has,

in effect, been diluted to the point where it has been assessed according to whether the court can fashion a single, over-arching topic to loosely relate the various subjects included in the statute under review.

Thus, in *Common Cause*, a bill was introduced amending Title 75 (the Vehicle Code) to provide for certain vehicle registration periods. Over the course of its life in the General Assembly, the bill expanded to include a variety of other measures, such as amendments to Title 74 (relating to transportation), as well as provisions pertaining to vehicle inspections, vehicle towing, public transportation, fuel taxes, competitive procurement for the Public Transportation Assistance Fund, and the distribution of State highway maintenance funds. *See Common Cause*, 710 A.2d at 112–13. The Commonwealth Court upheld the statute, stating that all of its provisions were germane to the general subject of vehicular transportation, *see id.* at 120, and this Court summarily affirmed, *see Common Cause/Pennsylvania v. Commonwealth*, 562 Pa. 632, 757 A.2d 367 (2000) (*per curiam*). Similarly, in *City of Phila. v. Schweiker*, 817 A.2d 1217 (Pa.Cmwlth.2003), the Commonwealth Court approved legislation relating to municipalities that also affected parking authorities, stating that the two topics were "inextricably intertwined" and that the overall subject of the legislation was "authorities that benefit municipalities." *Id.* at 1225;[19] *see also Fumo v. Public Util. Comm'n*, 719 A.2d 10, 14 (Pa.Cmwlth.1998) (upholding a bill which originally increased the number of years that a taxicab could be operated, but was subsequently amended to include deregulation of electricity generation, as both topics amended the Public Utility Code and dealt with public utility regulation); *Pennsylvania Chiropractic Fed'n v. Foster*, 136 Pa.Cmwlth. 465, 474, 583 A.2d 844, 848 (1990) (upholding legislation amending the Crimes Code, Judicial Code, and Vehicle Code, where all such amendments advanced the statute's goal of restructuring auto insurance regulation and reducing the cost of such insurance). *But see Pennsylvania*

**19.** That case is presently on appeal to this Court. *See City of Philadelphia v. Schweiker,* 12 EAP 2003.

*Ass'n of Rental Dealers v. Commonwealth,* 123 Pa.Cmwlth. 533, 540, 554 A.2d 998, 1002 (1989) (rejecting an argument that all the challenged amendments were germane to the single topic of the "economic well being of the Commonwealth," as that would render the germaneness test meaningless); *DeWeese,* 824 A.2d at 370 (rejecting the position that expunging criminal DNA records and apportioning negligence liability are both germane to the single subject of "the business of the courts").

We believe that exercising deference by hypothesizing reasonably broad topics in this manner is appropriate to some degree, because it helps ensure that Article III does not become a license for the judiciary to "exercise a pedantic tyranny" over the efforts of the Legislature. *In re Com., Dep't of Transp.,* 511 Pa. 620, 626, 515 A.2d 899, 902 (1986). There must be limits, however, as otherwise virtually all legislation, no matter how diverse in substance, would meet the single-subject requirement. *See Payne v. School Dist. of Borough of Coudersport,* 168 Pa. 386, 389, 31 A. 1072, 1074 (1895) *(per curiam )* (indicating that "no two subjects are so wide apart that they may not be brought into a common focus, if the point of view be carried back far enough").[20] In that event, Section 3 would be rendered impotent to guard against the evils that it was designed to curtail. Such vices reflect temptations which, being inherent to the law-making process, are present in every era. Historically, procedural limitations such as those contained in Article III, Section 3

> did not appear in the first state constitutions. Instead, they were adopted throughout the nineteenth century in response to perceived state legislative abuses. One observer during that era noted that '[o]ne of the most marked features of all recent State constitutions is the distrust shown of the Legislature.' Last-minute consideration of important measures, logrolling, mixing substantive provisions in omnibus bills, low visibility and hasty enactment of important, and sometimes corrupt, legislation, and the at-

**20.** Petitioners advance a *reductio ad absurdum* argument in this regard, and indicate that all legislation pertains to the single subject of "law."

tachment of unrelated provisions to bills in the amendment process—to name a few of these abuses—led to the adoption of constitutional provisions restricting the legislative process. These constitutional provisions seek generally to require a more open and deliberative state legislative process, one that addresses the merits of legislative proposals in an orderly and rational manner.

Williams, *State Constitutional Limits on Legislative Procedure*, at 798 (quoting Eaton, *Recent State Constitutions*, 6 HARV. L.REV. 109, 109 (1892)). Consistent with this background, the Constitution plainly establishes limitations on the Legislature's discretion in this area.

The legislation presently under review implicates many of the concerns quoted above. In its 127 pages, SB 1100 contains voluminous and varying provisions: many are substantial, most appeared at the last minute, and some are only hinted at in the title in the vaguest of terms (e.g., "making repeals"), if at all. Thus, if "[t]he purpose of the constitutional requirements relating to the enactment of laws [is] to put the members of the Assembly and others interested on notice, by the title of the measure submitted, so that they might vote on it with circumspection," *Scudder v. Smith*, 331 Pa. 165, 170–71, 200 A. 601, 604 (1938) (emphasis removed), that objective was not fulfilled here.

The Act's title states that one object—perhaps the primary object—of the statute is to amend Title 53 of the Pennsylvania Consolidated Statutes, which pertains to municipalities generally. The body of the bill, as well, contains various provisions affecting municipalities in some fashion, sometimes only indirectly. Significantly, however, there is no single unifying subject to which all of the provisions of the act are germane. *See Payne*, 168 Pa. at 389, 31 A. at 1074 (suggesting that the test under Section 3 is whether two disparate subjects constitute parts of a unifying scheme to accomplish a single purpose). It is not readily apparent, for example, that restricting the political activities of police officers has any logical or legislative nexus to authorizing parking authorities to undertake mixed-use development projects; or

that imposing a citizenship requirement for board members of business improvement districts relates to transferring authority over Philadelphia's taxis and limousines from the Public Utility Commission to the Philadelphia Parking Authority; or that any of these provisions are pertinent to the repeal of Section 209(k) of the PICA Act or to authorizing municipalities to hold gifts in trust. Respondents state that all such provisions relate to "municipalities," but, as virtually all of local government is a "municipality," we find that proposed subject too broad to qualify for single-subject status under Article III, Section 3. Whether or not it is akin to the "the business of the courts" or "the economic well being of the commonwealth"—proffered topics which, as noted, have been deemed overly broad to constitute a single subject for constitutional purposes—"municipalities" is the subject of an entire Title of the Pennsylvania Consolidated Statutes. By purporting to make general and diverse changes to that topic, with no other qualifications, SB 1100 is in substance an omnibus bill, whether or not it is called that in name.

Even were we to accept "municipalities" as the overarching subject of the act, moreover, a change in the composition of the Pennsylvania Convention Center Authority's governing board cannot readily be deemed germane to that topic, as the Convention Center is not a municipal authority, but rather, an instrument of the Commonwealth. Indeed, although respondent Convention Center Authority maintains that the "general subject matter of SB 1100 at all times was municipalities," Brief at 33, in arguing that the City lacks standing, it stresses that Convention Center Authority is an instrument of the Commonwealth and not of any municipality. *See id.* at 27. We agree with this latter assessment because, while the convention center statute indicates that the building housing conventions is to be located in Philadelphia, that legislation also clarifies that the Convention Center Authority is a Commonwealth authority created to serve state-wide interests, and not a municipal authority, *see generally* 53 Pa.C.S. §§ 5902–5923; 53 P.S. §§ 16201–16224 (repealed and recodified as amended at 53 Pa.C.S. §§ 5902–5923), and that that some of its governing members must be from outside of

Philadelphia. *See, e.g.*, 53 Pa.C.S. § 5911(a)(1) (requiring that several board members be residents of counties other than Philadelphia County); 53 P.S. § 16211(a)(1), (2) (repealed) (requiring, *inter alia*, that some of the Governor-appointed board members represent the interests of the Commonwealth at large, and that others be residents of counties other than Philadelphia County). Therefore, based upon this example alone, Act 230 cannot reasonably be deemed to pertain only to the single topic of municipalities, and thus, cannot be seen as containing only a single subject for purposes of Article III, Section 3. Finally, that all of the statute's provisions are ultimately codified within Title 53 is of little constitutional importance. *Cf. DeWeese*, 824 A.2d at 370 ("The fact that the changes in substantive law ... were set forth as amendments to the Judicial Code does not, in and of itself, satisfy the requirements of Article III, Section 3.").

Respondent Convention Center Authority argues, however, that Act 230 is constitutional because it is a "codifying and compiling bill." The Authority's position appears to be that the statute is exempted from the single-subject requirement under Section 3's exception for bills "codifying or compiling the law or a part thereof." *See supra* note 4. In this regard, the Authority takes issue with a portion of the Commonwealth Court analysis in which it noted that appropriation bills, which are also included within Section 3's exception to the one-subject rule, *see id.*, are separately constrained to a single subject under Section 11. *See* Pa. Const. art. III, § 11 ("The general appropriation bill shall embrace nothing but appropriations for the executive, legislative and judicial departments of the Commonwealth, for the public debt and for public schools. All other appropriations shall be made by separate bills, each embracing one subject.") The Commonwealth Court reasoned that Section 11 was intended to restrict the power of the legislature as a trade-off for the appropriation-bill exemption in Section 3, and stated that, while a codification bill is not constitutionally defined, "by analogy" the same limits should apply to them. *See* Commonwealth Ct. op. at 19–20.

Initially, we note that Act 230 is not a compiling bill, as it does not purport merely to compile existing statutory law

unaltered from its original substance. *See* Rubendall, *Constitution and Consolidated Statutes*, at 126–27 (explaining the difference between codifications and compilations).[21] *See generally* Joel Fishman, *A History of Statutory Compilations in Pennsylvania*, 86 LAW LIBR. J. 559 (1994). Further, Act 230 does not merely consolidate existing legislation into Title 53 of the Pennsylvania Consolidated Statutes. Rather, it both amends a Consolidated Statute and purports to consolidate existing law. While SB 1100 is thus a bill that, at least in part, "codifies ... the law," it does not follow that the bill necessarily comes within Section 3's exception to the single-subject requirement. To understand why, it is helpful to review the historical development of the codification of Pennsylvania statutes, and its relationship to Article III, Section 3.

Prior to 1970, Pennsylvania had a large and unwieldy body of uncodified statutory law. In his treatise, Judge Robert E. Woodside observed:

21. The author explains:
> A code has been defined as a complete system of positive law, scientifically arranged and promulgated by legislative authority. Drafting a code includes compiling existing laws, systematically arranging them into chapters, subheads, tables of contents, and indexes, harmonizing conflicts, supplying omissions, and generally clarifying and completing a body of laws designed to regulate exhaustively the subjects to which it relates. A compilation, on the other hand, is merely an arrangement and classification of legislation in the exact form and wording in which it was enacted originally. It simply brings together in convenient form the various acts of the legislature over a period of time. Thus, a code is quite different from a compilation. A code is broader in scope and more comprehensive in purpose. Its general object is to embody, as nearly as practicable, all the statutory laws of a governmental entity. When properly adopted by the legislature, a code is more than prima facie evidence of the law; it is positive law itself. An officially or privately prepared compilation, however, is published only to facility discovery of the law. Usually a compilation does not eliminate repealed laws; instead it collects all laws on the same subject regardless of their operative effect. Even when a compilation has been given legislative approval, it does not affect the status of the law: final authority remains in the statutes as originally enacted.

Rubendall, *Constitution and Consolidated Statutes*, at 126–27 (footnotes omitted). *Accord* William H. Clark, Jr., *Introduction to the Pennsylvania Consolidated Statutes*, at 6–7 (reproduced at 1 Pa.C.S., introductory text).

Much of our law, civil and criminal, developed in the [Nineteenth C]entury as part of the common law, but during [the Twentieth C]entury more and more statutes replaced the common law. Unlike the so-called "code states" which from their formation depended solely upon an organized single code containing all the statutory law of that state, Pennsylvania's statutes "grew like Topsy." As a result, the only way to find the statutes on a particular subject was through digests such as West's Statutes and, more recently, Purdon's Pennsylvania Statutes. Purdon's has seved [sic] the profession well becoming "the Bible" of the statutory law, but the "official" statues are in the Pamphlet Laws and not Purdon's.

Although no attempt was made to officially codify the entire body of the law, many specific subjects were codified, such as in the Vehicle Code, the Crimes Code, the Commercial Code, the numerous municipal codes, and many, many others.

WOODSIDE, PA. CONSTITUTIONAL LAW, at 307. These pre–1970 codifications merely represented attempts to classify and collect statutes, and did not result in true consolidated statutes. One hindrance to consolidation may have been the single-subject requirement of Section 3—which originally did not exempt codifications or compilations—and the underlying concerns it represented. *See* Clark, *Introduction to Pennsylvania Consolidated Statutes,* at 14 ("The principal adverse comment expressed concerning codification is that ultimately it could re-establish the 'logrolling' practices outlaws by the single subject requirement of Article III, § 3 of the Constitution of Pennsylvania."). Thus, in 1967, the exception for any "bill codifying or compiling the law or a part thereof" was added to Section 3. Thereafter, in 1970, the General Assembly enacted a general "code" known as the Pennsylvania Consolidated Statutes,[22] which was originally the structural framework for the eventual consolidation of all Pennsylvania statutes—that is, a kind of "skeleton . . . given body by addition of

---

**22.** Act of November 25, 1970, P.L. 707, No. 230 (as amended, 1 Pa.C.S. §§ 101–306).

substantive provisions drafted as amendments to Act 230 [of 1970] under appropriate title headings." Rubendall, *Constitution and Consolidated Statutes*, at 130. Since 1970, the Legislature has added some of the pre-existing codes to the Consolidated Statutes and has created other titles.

 The scope of Section 3's exception must be construed consistent with the reason it came into being. "What the amendment has done is authorize the adoption of the Consolidated Statutes and remove all doubt about the constitutionality of the existing codes." WOODSIDE, PA. CONSTITUTIONAL LAW, at 309. Such bills often contain more than one subject, but, because they do not effect substantive changes in the law, they lack the potential for mischief that Section 3 was intended to remedy. Thus, we do not believe that the electorate, in approving the amendment to Section 3, intended to give the Legislature license to include, within any bill consolidating an existing statute, unrestricted substantive revisions to the law unrelated to the process of codification, as otherwise the one-subject provision would be of little value. As Judge Woodside has explained:

> Legislators and the professional draftsmen have avoided the position that an amendment to the Pennsylvania Consolidated Statutes can contain more than one subject clearly expressed in its title as that provision has been construed by the courts. They recognize, as every official should, that it was not the intent of the language added to the section in 1967 to write out of the Constitution the one-subject provision which has been so valuable to the orderly operation of the legislature in this Commonwealth.

*Id.; accord DeWeese*, 824 A.2d at 370–71.

 In light of the above, we conclude that the exception to the single-subject requirement for legislation "codifying ... the law or a part thereof" pertains to bills which codify the law and make only such alterations in form and content as are necessary to effect the codification. *See id.* at 370 n. 14 ("The goals of the single subject rule, such as preventing logrolling, do not pertain where laws that have previously been enacted are simply being readopted in codified form, with revisions to

the language of the prior enactments made only as needed to create a unified body of law by harmonizing conflicts, filling omissions and otherwise clarifying the existing law that goes into the code.")

The statute presently under review does not fit this description. As discussed above, it was originally introduced to make amendments to Title 53 of the Consolidated Statutes and, prior to the final amendment by the Senate Rules Committee, was altered several times to make various substantive legal changes within that Title. Thereafter, the amendments inserted by the Senate Rules Committee, among other things, codified and revised the Pennsylvania Convention Center Authority Act of 1986. The Convention Center Authority is correct, then, that a portion of the final bill operated to consolidate some existing law, namely, the Convention Center Authority Act. However, it also amended that statute beyond what was necessary to effect the codification, and further, made many additional substantive revisions to other areas of Pennsylvania statutory law unrelated to the process of codification. Accordingly, Act 230 is not exempted from Section 3's single-subject requirement pursuant to that provision's express exception for codification bills.

Nor are we persuaded by the Convention Center Authority's argument that the absence of any constitutional provision extrinsic to Section 3 defining the parameters of a permissible codification bill (which would perform a similar function to that which Section 11 performs for appropriation bills) indicates an intent not to apply the single-subject restriction to any bill which codifies in part. In making this argument, the Authority overlooks an important distinction between appropriation bills and codification bills: a legislative appropriation constitutes substantive law, as it allocates money, whereas a legislative codification leaves existing substantive law unchanged. There is thus a need for independent constraints upon appropriation bills—which by nature contain more than one subject, and hence, had to be exempted from Section 3's one-subject requirement—in order to prevent the logrolling and omnibus-style abuses that Section 3 was designed to

guard against. *See Commonwealth ex rel. Attorney General v. Barnett*, 199 Pa. 161, 172, 48 A. 976, 977 (1901); *Commonwealth ex rel. Greene v. Gregg*, 161 Pa. 582, 587, 29 A. 297, 298 (1894). *See generally Common Cause of Pa. v. Commonwealth*, 668 A.2d 190, 197 (Pa.Cmwlth.1995) (describing the "trade-off" whereby legislative power was restricted by Section 11 in exchange for the exclusion of appropriation bills from the prohibitions of Section 3), *aff'd per curiam*, 544 Pa. 512, 677 A.2d 1206 (1996). The same concerns are absent as to bills which merely codify existing law, even if more than one subject is codified by a single bill.

For the reasons expressed above, we find that SB 1100 violates Section 3's prohibition against multi-subject bills. As it would be arbitrary to preserve one set of provisions germane to one topic, and invalidate the remainder of the bill, we have no choice but to conclude that Act 230 must be declared unconstitutional in its entirety.[23]

*2. Article I, Sections 1, 4 and 6 challenges*

As discussed, in addition to challenging the validity of SB 1100 under Article III, Section 3, Petitioners assert that SB 1100 violates Article III, Sections 1, 4 and 6 of the Pennsylvania Constitution. As we have already determined that the bill must be invalidated in its entirety under Section 3, we need not reach these claims.

### III.

 Having found that Act 230 is inconsistent with Article III, Section 3, it remains to determine the proper remedy. While the provisions of the statute cannot stand on their present foundation, as a consequence of the automatic supersedeas the legislation has remained in effect pending the

---

**23.** We contrast this situation with cases in which the title contains a single subject, and the Court strikes down only that portion of the bill which is not pertinent to that subject as violative of Section 3's clear expression requirement. *See, e.g., In re Phillips' Estate*, 295 Pa. 349, 353, 145 A. 437, 438 (1929); *Strain v. Kern*, 277 Pa. 209, 211, 120 A. 818, 819 (1923). Here, the multiple subjects, including the changes to the Convention Center Authority Act, are reflected in the bill's title.

outcome of this litigation. Although there is no information in the record before us concerning what activities have been undertaken in conformity with the provisions of the statute, we are inclined to exercise caution by assuming that some have already occurred—such as reconstitution of the governing board of the Convention Center Authority, a transfer of regulatory authority over taxis and limousines to the Philadelphia Parking Authority, and commencement of mixed-use development projects by the Parking Authority—which cannot readily or immediately be undone. Moreover, our decision here pertains to the way in which the legislation authorizing these changes was passed; nothing in this Opinion precludes the General Assembly from enacting similar provisions in a manner consistent with the Constitution. Thus, rather than presently disturbing the status quo and risking circumstances of ongoing flux, we think it best to stay our decision for ninety days in order to afford time for the Legislature to consider appropriate remedial measures, or to allow for an orderly transition.

Accordingly, Petitioners are awarded declaratory relief as delineated above. This mandate is stayed for a period of ninety days. Jurisdiction is relinquished.