IN THE COMMONWEALTH COURT OF PENNSYLVANIA

South Fayette Township, Bridgeville :
Borough, and Collier Township, :
            Petitioners :
             :
             :
        v. : No. 404 M.D. 2021
             :
Pennsylvania Department of :
Transportation, Public-Private :
Transportation Partnership Board :
(P3 Board) and Yassmin Gramian, :
P.E., in their official capacity as :
Chairperson of the P3 Board, :
            Respondents : Argued: May 18, 2022

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
               HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE ANNE E. COVEY, Judge
               HONORABLE MICHAEL H. WOJCIK, Judge
               HONORABLE ELLEN CEISLER, Judge
               HONORABLE LORI A. DUMAS, Judge
               HONORABLE STACY WALLACE, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                          FILED: June 30, 2022

Before this Court are the cross-applications for summary relief filed by South Fayette Township, Bridgeville Borough, and Collier Township (collectively, Petitioners), and the Pennsylvania Department of Transportation (DOT), the Public-Private Transportation Partnership Board (Board), and Yassmin Gramian, P.E., in her official capacity as Chairperson (Chair) of the Board (collectively, Respondents). Petitioners seek declaratory and injunctive relief against Respondents regarding the Major Bridge P3 Initiative (Initiative), a statewide plan to use public-private

partnerships (P3) to repair or replace major bridges in the Commonwealth, pursuant to the Act of July 5, 2012, P.L. 853, No. 88 (Act 88).[1]

Petitioners allege that Respondents both exceeded their statutory authority under Act 88 and failed to comply with its requirements when approving the Initiative, rendering the Initiative void *ab initio*. Petitioners similarly challenge a subsidiary project of the Initiative that would replace the I-79 span over State Route 50 in Bridgeville, Pennsylvania (I-79 Bridge), a project to be funded through the imposition of tolls on the I-79 Bridge. Respondents argue that the issues Petitioners raise are not justiciable and barred by sovereign immunity and the strict language of Act 88. For the reasons that follow, we grant in part Petitioners' application for summary relief and declare the Major P3 Bridge Initiative void *ab initio*.

## I. Background

## A. The Act

Section 3 of Act 88 established the Board, whose members are comprised of the Secretary of DOT (Secretary) or the Secretary's designee, the Secretary of the Budget or his/her designee, four members appointed by the General Assembly (GA), and one member appointed by the Governor. 74 Pa.C.S. § 9103. Members appointed by the GA under subsection (3) are selected by the majority and minority leaders of the Pennsylvania House of Representatives and the Senate. 74 Pa.C.S. § 9103(c). Those members must have experience with transportation, finance, law, or land use and planning, as must the member appointed by the Governor under subsection (4). 74 Pa.C.S. § 9103(c)-(d). Board members receive no compensation,

---

[1] 74 Pa.C.S. §§ 9101-9124. Act 88 permits governmental entities (like DOT) to make agreements with the private sector to design, build, finance, operate, or maintain transportation projects, which they would not otherwise be legally permitted to do under traditional public development laws, such as through the Commonwealth Procurement Code, 62 Pa.C.S. §§ 101-2311.

and apart from any salary earned as a Commonwealth employee, may not have any significant financial interest in a public or private entity that comes before the Board under Act 88. 74 Pa.C.S. § 9103(f), (h).

Section 4 of Act 88 establishes the Board's duties and provides, in part:

> **(a) Duties.**—The [B]oard shall do all of the following:
>
> (1) Meet as often as necessary but at least annually.
>
> (2) *Adopt guidelines establishing the procedure by which a public entity may submit a request for a transportation project* or a private entity may submit an unsolicited plan for a transportation project to the [B]oard.
>
> (3) *Consult with persons affected by proposed transportation projects.*
>
> (4) Evaluate and, *where the [B]oard finds that the requests or plans for transportation projects are in the best interests of the Commonwealth and a public entity*, approve the requests or plans for transportation projects. The [B]oard shall approve a proposed transportation project by adopting a resolution.
>
> (5) Submit an annual report to the General Assembly detailing all transportation projects evaluated and resolutions adopted.
>
> **(b) Actions.**—*Actions by the [B]oard are a determination of public policy and public interest* and shall not be considered adjudications under 2 Pa. C.S. Chs. 5 Subch. A (relating to practice and procedure of Commonwealth agencies) and 7 Subch. A (relating to judicial review of Commonwealth agency action) and shall not be appealable to [DOT] or a court of law.

3

74 Pa.C.S. § 9104 (emphasis added). Per this Section, the Board approves proposed "transportation project[s]." Section 2 of Act 88 defines that term, and the related term "transportation facility," as follows:

> **"Transportation facility."** A *proposed or existing* road, bridge, tunnel, overpass, ferry, busway, guideway, public transportation facility, vehicle parking facility, port facility, multimodal transportation facility, airport, station, hub, terminal or similar facility used or to be used for the transportation of persons, animals or goods, together with any buildings, structures, parking areas, appurtenances, intelligent transportation systems and other property needed to operate or related to the operation of the transportation facility. The term includes any improvements or substantial enhancements or modifications to an existing transportation facility.

> **"Transportation Project."** An *undertaking* by a private entity or a public entity, other than the public entity providing or improving its own transportation facilities, *to provide or improve a transportation facility* or transportation-related service which is totally or partially located within this Commonwealth.

74 Pa.C.S. § 9102 (definitions) (emphasis added).

Section 5 of Act 88 requires that DOT supply technical, legal, and financial assistance to the Board in carrying out its duties and to develop a detailed analysis of a request or recommendation *prior* to the Board's approval. 74 Pa.C.S. § 9105.

Proposed projects come before the Board in several ways. A "request" is a plan for a transportation project submitted to the Board by a public entity. 74 Pa.C.S. § 9102. Public entities may obtain such plans through a solicitation process under Section 6 of Act 88, requiring public notice and an assessment of whether the proposals are in the public entity's best interest. 74 Pa.C.S. § 9106. Public entities may also accept unsolicited plans from private entities. Section 8 of Act 88, 74

4

Pa.C.S. § 9108. Finally, private parties may submit unsolicited plans directly to the Board. 74 Pa.C.S. § 9104(a)(2). Act 88 encompasses a broad scope of different "delivery methods" regarding what development services a private partner will provide, including any nontraditional delivery method that will serve the public interest. 74 Pa.C.S. § 9108. Act 88 specifically authorizes the Board to approve "[p]redevelopment agreements [PDA] leading to other implementing agreements." *Id.*

Pursuant to Section 4(c)(1) of Act 88, the GA may rescind the Board's approval of a transportation project "within 20 calendar days or nine legislative days, whichever is longer," by passing a concurrent resolution rescinding the approval of a transportation project, provided that the Commonwealth owns the transportation facility that is the subject of the transportation project. 74 Pa.C.S. § 9104(c)(1). If the GA fails to adopt the concurrent resolution by majority vote in both the Senate and the House of Representatives within the time period under paragraph (c)(1), the transportation project shall be deemed approved. 74 Pa.C.S. § 9104(c)(3).

Once a transportation project is approved by the Board, the relevant public entity executes a contract for the project with a private partner through a competitive bidding process. Section 9 of Act 88, 74 Pa.C.S. § 9109. This process requires public notice of the bid opportunity, submission of sealed proposals, a selection process by the public entity, and a protest process for aggrieved bidders. *Id.* Section 10 of Act 88 identifies the provisions that must be included in any P3 agreement. 74 Pa.C.S. § 9110.

Pursuant to Section 4(a)(2) of Act 88, the Board "shall" adopt guidelines that govern the submission of transportation project requests to the Board. 74 Pa.C.S. § 9104(a)(2). To that end, the Board adopted an "Implementation Manual and

Guidelines" for Act 88 (P3 Manual).[2]  The P3 Manual identifies two offices internal to DOT that are relevant to the instant matter:  the PennDOT Office of Private Public Partnerships (P3 Office) and the P3 Steering Committee.  The P3 Office, which reports to DOT's Deputy Secretary for Planning, the Secretary of Transportation, and the Board, oversees and administers "all aspects of the [P3] program, from identifying, screening and prioritizing candidate P3 Projects for approval by the . . . Board to development, procurement, and contract management."  PFR, Ex. 1 at 11. The P3 Steering Committee is chaired by the Secretary of Transportation and consists of DOT officials, DOT's Chief Counsel, the Secretary of Budget, the Secretary of Policy and Planning, and the Governor.  *Id.* at 13-14.

The P3 Manual describes the project screening process, which consists of two phases.  The first, high-level review is based on information submitted by the public entity using DOT's "Candidate Project Form[,]" which requires the identification of a proposed project's details, such as location, length, general scope, purpose and need, its total estimated cost, and the identification of a preliminary financial plan and the jurisdictions impacted by the proposed project.  *Id.* at 16, PFR, Ex. 3 at 2-3. The Candidate Project Form also requires that the public entity identify the expected proposed project benefits, the rationale and precedent, if any, for utilizing the P3 approach.  PFR, Ex. 3 at 3-4.  If the proposed project passes the first screening phase, a second review occurs that undertakes a "[m]ore detailed quantitative and qualitative analysis" of the factors required for the first screening phase, plus any additional considerations deemed appropriate by the P3 Office and the public entity. *Id.* at 21.

---

[2] *See* Petitioners' November 11, 2021 Petition for Review (PFR) Ex. 1, P3 Manual. https://www.penndot.pa.gov/ProjectAndPrograms/p3forpa/Documents/P3-Implementation-Manual.pdf) (last viewed June 29, 2022).

6

The P3 Manual expressly acknowledges the Board's statutory duties, stating:

> Part and parcel of the evaluation process is *a requirement that there be consultation with persons affected by a **proposed** project*. Proposed projects found by the . . . Board to be in the best interest of the Commonwealth and a [p]ublic e]ntity are to be approved by resolution.
>
> . . . .
>
> The . . . Board will adopt guidelines establishing the procedures by which a [p]ublic [e]ntity may submit a Request for a Transportation Project or a Private Entity may submit an Unsolicited Proposal for a Transportation Project to the . . . Board; *consult with public and private parties affected by **proposed** Transportation Projects*; and submit an annual report to the [GA] detailing all the Transportation Projects evaluated and approved.

*Id.* at 2 (emphasis added). The P3 Manual summarizes the following "Key Action Items" for project screening and approval, which appear to be set forth in sequential order:

- P3 Office develops high-level screening report
- P3 Office presents project to [P3] Steering Committee for review
- [P3] Steering Committee makes a recommendation based on policy analysis and feasibility
- If recommended by the [P3] Steering Committee the P3 Office conducts a detail-level screening
- If a project is not recommended, the [p]ublic [e]ntity can decide to accept the Steering Committee recommendation or proceed directly to the Board to request a detailed analysis be performed
- P3 Office performs detail-level analysis and presents it to the [P3] Steering Committee

7

- [P3] Steering Committee makes [r]ecommendation to the . . . Board whether to approve the project
- . . . *Board consults with affected persons and [a]pproves or [d]isapproves*
- [An] approved project [is] submitted to the [GA] for consideration if subject transportation facility is owned by the Commonwealth
- P3 Office notifies relevant [p]ublic [e]ntity
- If approved, [p]ublic [e]ntity begins procurement process

*Id.* at 26-27 (emphasis added). A similar screening process takes place for unsolicited projects, including a requirement that the Board consult "with affected persons and [a]pproves or [d]isapproves." *Id.* at 27-28.

### B. Factual Background

The underlying facts of this matter are not in dispute.[3] On November 12, 2020, pursuant to its authority under Act 88, the Board unanimously approved a resolution approving the Initiative, allowing DOT to repair or replace bridges throughout the Commonwealth by means of P3 agreements. PFR, Ex. 6 (Resolution). The Resolution did not identify which Pennsylvania bridges would be subject to repair or replacement under the Initiative.

On February 18, 2021, DOT announced, for the first time, nine specific bridges under consideration for reconstruction and tolling pursuant to the Initiative, including the I-79 Bridge. PFR, Ex. 7 (2/18/21 DOT press release). Thereafter, in a March 24, 2021 letter to the Chair/Secretary, several members of the GA expressed their concern that the Resolution approving the Initiative did not satisfy the

---

[3] An application for summary relief is evaluated according to the standards for summary judgment and may be granted if a party's right to judgment is clear and no issues of material fact are in dispute. *Myers v. Com.*, 128 A.3d 846, 849 (Pa. Cmwlth. 2015). To be entitled to summary relief, the parties must demonstrate the nonexistence of any genuine issue of material fact. *Thompson Coal Co. v. Pike Coal Co.,* 412 A.2d 466 (Pa. 1979).

requirements of Section 4 of Act 88, which requires that the Board evaluate and approve transportation projects, if they are found to be in the best interests of the Commonwealth. *Id.*, Ex. 9. The GA members noted that Section 2 of Act 88 defines a transportation project as "an undertaking . . . to provide or improve a transportation facility[,]" which is thereafter defined as a "*proposed or existing . . . bridge*[.]" *Id.* (emphasis in original); 74 Pa.C.S. § 9102. The Board's Resolution left open questions regarding the identification of bridges that were the subject of the Resolution, the private entity involved, and the specific method of delivering the project "to the people of the Commonwealth[.]" PFR, Ex. 9. The letter questioned how the GA could "weigh the efficacy of [the Board's R]esolution" "[i]n the absence of any effort [by the Board] to provide those answers[.]" *Id.* The members of the GA urged the Board to withdraw the Resolution until such time as the Board could provide the information necessary to the GA's "deliberative process." *Id.*

In a written response dated April 15, 2021, the Secretary conceded that the Resolution did not identify the candidate bridges; however, she asserted that such a practice was consistent with prior projects approved by the Board. *Id.*, Ex. No. 10. The Secretary indicated that the list of candidate bridges was not final, as the public comment and hearing process had yet to be completed. *Id.* Finally, DOT could not identify the private entity involved in the Initiative, as the procurement process had not yet taken place. *Id.*

### C. The Present Action

Petitioners filed their PFR pursuant to the Declaratory Judgments Act[4] on November 11, 2021, seeking declaratory and injunctive relief and alleging that the Board exceeded its statutory authority under Act 88, failed to comply with Act 88's

---

[4] 42 Pa.C.S. §§ 7531-7541.

9

mandates, and failed to identify the 1-79 Bridge project as part of the Initiative prior to approval thereof. PFR, ¶ 7. An Initiative "Project White Paper" (White Paper) commissioned by DOT in 2020, which formed DOT's basis for recommending the Initiative to the Board, identified several principles and benefits that would flow from the Initiative, such as the imposition of user fees, or tolls, that would accelerate the completion of necessary transportation projects. *Id.*, ¶¶ 44-45, 47; Ex. 5. The White Paper failed to identify, however, any specific bridges by name, location, or need that would be impacted by the Initiative. *Id.*, ¶ 47. The White Paper recommended that the Initiative proceed using the P3 model established under Act 88 and "following the process as delineated in the [P3 Manual]." *Id.* ¶ 47; Ex. 5. The Board's November 12, 2020 Resolution likewise failed to identify any specific bridge projects included in the Initiative. *Id.*, ¶ 51.

As the I-79 Bridge project was not identified until after the Board approved the Resolution, Petitioners suggest that neither DOT nor the Board could have considered whether the I-79 Bridge project was in the best interests of the Commonwealth or that it was an appropriate project for the P3 model under Act 88. *Id.*, ¶¶ 64-65. Petitioners allege that the Board failed to comply with the statutory requirements of Act 88, as well as the screening process outlined in the P3 Manual, which includes consultation with affected municipalities and stakeholders. *Id.*, ¶ 55. They maintain that Act 88's requirement that the Board consult with affected "persons" before approving a transportation project inherently requires that a proposed transportation project contain the specificity required to determine the persons affected. *Id.*, ¶ 68.

Petitioners submit that the I-79 Bridge is located partially in South Fayette Township and Bridgeville Borough and borders Collier Township. *Id.*, ¶¶ 6, 10-12.

10

As a result, Petitioners are affected persons under the terms of Act 88. *Id.*, ¶ 81. Petitioners were not consulted prior to the Board approving the Resolution, or at any time prior to DOT's identification of the I-79 Bridge as part of the Initiative, and Petitioners had no independent means of discovering that the Initiative would impact their communities. *Id.*, ¶ 82. The I-79 Bridge Project would significantly impact Petitioners, as traffic would shift to local roads in an attempt to avoid tolls on the I-79 Bridge. *Id.*, ¶ 83. Petitioners allege that local roads are inadequate to accept this anticipated additional traffic. *Id.*, ¶ 84.

Count I of the PFR requests a declaration that the Resolution approving the Initiative and the I-79 Bridge project violate Act 88. PFR at 23-25. Count II requests a declaration that the Initiative and I-79 Bridge project are unconstitutional delegations of legislative power, in contravention of the United States and Pennsylvania Constitutions. *Id.* at 28-29. Count III seeks a preliminary injunction against both the Initiative and the I-79 Bridge project.[5] *Id.* at 29-31. Count IV seeks a permanent injunction against the Initiative and the I-79 Bridge project. *Id.* at 31-33.

Respondents filed preliminary objections to the PFR, arguing that it fails to state a claim upon which relief can be granted because Respondents are protected by sovereign and official immunity, which Section 17 of Act 88 reaffirmed. They also object that Petitioners lack standing to sue, as Petitioners have no authority to challenge actions taken by the Board and DOT under Act 88. Respondents further object that Petitioners have not pled the elements required for a preliminary injunction, as the harm they allege is neither immediate nor irreparable. Petitioners

---

[5] Petitioners filed a separate petition for preliminary injunction on December 9, 2021, which largely reiterated the allegations made in the PFR. Petitioners agreed to withdraw this petition following a status conference between the parties. See infra, page 12.

have likewise failed to establish the right to a permanent injunction because Act 88's legislative review process affords an adequate remedy at law. Finally, Respondents object that Petitioners' claims are nonjusticiable and Section 4(b) of Act 88 renders the Board's actions non-appealable.

On December 14, 2021, Respondents filed an application for summary relief, in which they reasserted the position that Petitioners' PFR is barred by sovereign immunity, that Petitioners lack standing to pursue injunctive and declaratory relief, or to pursue a claim against the Commonwealth on behalf of their citizens, that the Board's actions are not appealable under the plain language of Act 88, and that Petitioners have not established a right to preliminary or permanent injunctive relief.

Following a status conference held on January 6, 2022, Petitioners agreed to withdraw their petition for preliminary injunction and Respondents agreed to stay any resolution regarding their preliminary objections. The parties would thereafter file cross-applications for summary relief, along with supporting briefs, and the matter would be listed for oral argument.

Petitioners' application for summary relief retains the requests for declaratory and permanent injunctive relief set forth in their PFR. They assert that the Initiative is void *ab initio* because it was approved in violation of Act 88. More specifically, Section 5(b) of Act 88 requires that DOT develop a detailed analysis of a transportation project request or recommendation prior to Board approval. Before approving a transportation project pursuant to Act 88, Section 4(a)(3) of Act 88 mandates that the Board first consult with persons affected by the proposed transportation project. This necessarily requires that identification of the transportation project take place prior to Board approval. Petitioners allege that none of these actions took place. Instead, the Board passed the Resolution approving the

12

Initiative and delegated to DOT, an agency that is not subject to legislative oversight under Act 88, the duty of identifying the specific transportation projects that would take place.

Petitioners request that this Court declare the Initiative, and the I-79 Bridge project, void based on Respondents' failure to comply with the statutory requirements of Act 88 and the screening process set forth in the P3 Manual. Petitioners also seek a declaration that Respondents' actions constitute an unconstitutional delegation of legislative authority. Finally, Petitioners seek a decree permanently enjoining the I-79 Bridge project.

Respondents filed an amended application for summary relief, which essentially reiterates the arguments set forth in their December 14, 2021 application for summary relief. They assert that Petitioners' claims are non-justiciable, as they implicate the political question doctrine, that Petitioners lack standing to challenge Respondents' actions taken pursuant to Act 88 or to bring an action against the Commonwealth on behalf of their citizens, and that Petitioners' claims are not ripe, as the harms they allege are merely speculative. Respondents also assert that the relief sought is barred by the strict language of Act 88 and sovereign immunity. Finally, Respondents maintain that injunctive relief is precluded as a matter of law because Act 88 provides a mechanism of redress by which the GA may rescind any resolution passed by the Board. By way of relief, Respondents request that this Court dismiss the PFR.

Having heard argument on this matter on May 18, 2022, *en banc*, it is now ripe for this Court's disposition.[6]

---

[6] Berks County, along with several municipalities in Berks County, and the Pennsylvania Motor Truck Association filed amicus curiae briefs, in which they raised concerns with the
**(Footnote continued on next page…)**

## II. Discussion

We will first review the issues raised in Respondents' application for summary relief, as our resolution of those issues will determine the extent to which we address the merits of Petitioners' claims.

## A. Sovereign Immunity

"Suits which seek to compel affirmative action on the part of state officials or to obtain money damages or to recover property from the Commonwealth are within the rule of immunity; *suits which simply seek to restrain state officials from performing affirmative acts are not within the rule of immunity*." *Phila. Life Ins. Co. v. Com.*, 190 A.2d 111, 114 (Pa. 1963) (emphasis added); *accord Finn v. Rendell*, 990 A.2d 100, 105 (Pa. Cmwlth. 2010) ("[S]overeign immunity does not bar a declaratory judgment action or injunction seeking to prohibit state parties, *i.e.*, state agencies or employees, from acting."). "[I]t is the substance of the relief requested and not the form or phrasing of the requests which guides [the] inquiry." *Stackhouse v. Pa. State Police*, 892 A.2d 54, 61 (Pa. Cmwlth. 2006). Thus, a suit that fundamentally seeks to restrain state action, and seeks declaratory relief that is prohibitory rather than mandatory in nature, is within this Court's jurisdiction. *See Fawber v. Cohen*, 532 A.2d 429, 433-34 (Pa. 1987).

First, we address whether Petitioners' claims are barred by sovereign immunity. Respondents argue in the affirmative, citing article I, section 11 of the Pennsylvania Constitution[7] and Section 17 of Act 88, which expressly reaffirms

Initiative's approval process, and the anticipated harm caused by implementation of the Initiative. We denied a similar request filed by Luzerne County on the basis that briefing in this matter was complete, but granted Luzerne County leave to join in the brief already filed by Petitioners.

[7] Article I, section 11 provides that "[s]uits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct." Pa. Const. art. I, §11.

sovereign immunity subject to limited exceptions.[8]   Respondents tacitly acknowledge that sovereign immunity is inapplicable to declaratory judgment actions or claims that seek prohibitory injunctions to restrain state action.  They assert, however, that declaratory and injunctive relief are precluded where a statutory scheme that otherwise waives sovereign immunity fails to specifically do so for actions seeking declaratory and injunctive relief.  In support of their argument, Respondents cite *Scientific Games International, Inc. v. Commonwealth*, 66 A.3d 740, 757-58 (Pa. 2013), in which our Supreme Court held that sovereign immunity barred a suit for declaratory and permanent injunctive relief in the context of the Procurement Code.

In response, Petitioners argue that their claims are not barred by sovereign immunity, as they are not requesting monetary damages from Respondents or an order compelling affirmative action on their part.  Rather, Petitioners seek a determination that Respondents approved the Initiative without statutory authority and an injunction preventing Respondents from taking any further action pursuant to the Initiative, claims for which Respondents may not assert sovereign immunity.

---

[8] Section 17 of the Act, 74 Pa.C.S. § 9117, provides:

> Under [s]ection 11 of [a]rticle I of the Constitution of Pennsylvania, it is declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees, and a municipal authority, and its officials and employees, acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as provided in section 18 of Act 88 (relating to specific performance). A claim against the Commonwealth and its officials and employees or municipal authority and its officials and employees shall be brought only in such manner and in such courts and in such cases as directed by the provision of section 9110(e) (relating to Public-Private transportation partnership agreement), 42 Pa. C.S. Ch. 85 (relating to matters affecting government units), 62 Pa. C.S. Ch. 17 (relating to legal and contractual remedies) or any procurement law applicable to a municipal authority.

15

Petitioners further contend that *Scientific Games* is distinguishable, as that holding hinged on the Supreme Court's interpretation of the Procurement Code in conjunction with the exclusive jurisdiction awarded to the Board of Claims for contract disputes arising under the Procurement Code.

We agree with Petitioners that *Scientific Games* does not control our disposition here, as that decision represents a limited exception to the general rule that sovereign immunity does not bar prohibitory relief. In *Scientific Games*, the Department of Revenue (Revenue) issued a request for proposals (RFP) under the Procurement Code for the development of a slot machine monitoring system. *Scientific Games*, 66 A.3d at 744. Revenue selected the petitioner's proposal, and the parties began negotiating the terms of a contract. *Id.* The resultant contract was circulated between the parties, but it was not fully executed before Revenue cancelled the RFP and, by extension, the awarded contract. *Id.* at 744-46. The petitioner filed an action against Revenue under this Court's original jurisdiction, seeking declaratory and injunctive relief and requesting an order directing Revenue to honor the negotiated contract. *Id.* at 746. Revenue filed preliminary objections asserting, among other issues, that the Board of Claims had exclusive jurisdiction over the petitioner's claims. This Court overruled Revenue's preliminary objections after concluding that we had jurisdiction under the Declaratory Judgments Act. Revenue appealed to the Supreme Court, which reversed. The Supreme Court recognized that the Procurement Code provides "a scheme for resolution of disputes arising in connection with the solicitation or award of a contract," and vests exclusive jurisdiction over such disputes in the Board of Claims. *Id.* at 743 (citing 62 Pa.C.S. § 1711.1). In light of this detailed remedial scheme, "the Board of Claims retain[ed] exclusive jurisdiction [over contract disputes,] which [could not] be

16

supplanted by a court of law through an exercise of original jurisdiction." *Id.* at 760. The Court's reasoning was premised on the Procurement Code's "self-contained reaffirmation of sovereign immunity, and its explicit, limited waiver of such immunity (among other specified and limited waivers) *in connection with a coordinate allocation of 'exclusive jurisdiction' to the Board of Claims over actions arising from certain contracts entered into by a Commonwealth agency.*" *Id.* at 756. Accordingly, the Supreme Court held that, where the GA has not specifically provided by statute for such nonmonetary relief in a claim *arising from a contract entered into by a Commonwealth agency under the Procurement Code*, the claim is either within the exclusive jurisdiction of the Board of Claims or it is barred by sovereign immunity. The GA did not intend to leave the Commonwealth Court with residual jurisdiction to entertain actions for declaratory and injunctive relief by aggrieved bidders that had not executed a contract with the Commonwealth. *Id.* at 756, 758.

*Scientific Games* is distinguishable from the instant matter on two points. First, while the underlying action ostensibly requested injunctive and declaratory relief, it effectively sought specific performance of a contract with the Commonwealth and was thus tantamount to a contract dispute under the Procurement Code – precisely the sort of claim that is typically barred by sovereign immunity. Here, by contrast, the underlying claims are in the nature of declaratory and prohibitory injunctive relief that aim to address Respondents' alleged violation of Act 88. The claims here were not brought by a disappointed bidder or other party with a contractual claim. Rather, they seek to restrain allegedly unlawful activity by Respondents, regardless of any contractual rights. Such claims are generally not barred by sovereign immunity.

17

Furthermore, our Supreme Court's reasoning in *Scientific Games* hinged on the Procurement Code's unique remedial scheme, which differs markedly from Act 88. Though both statutes expressly reaffirm sovereign immunity, Act 88 does not contain any administrative remedial process whatsoever, nor does it establish an administrative body such as the Board of Claims with jurisdiction to adjudicate Petitioners' claims. Absent such a particularized remedial scheme, it appears the General Assembly *did* "intend to leave the Commonwealth Court with residual jurisdiction to entertain requests for declaratory relief and/or prohibitive . . . injunctions," as is the norm for such claims against the Commonwealth. *Id.* at 758. Thus, this Court concludes that sovereign immunity does not bar this action.

## B. Non-justiciable Claims

Next, we address whether Petitioners have asserted justiciable claims. Respondents argue that they have not, as Petitioners seek review of political questions that are not subject to judicial scrutiny, Petitioners lack standing to bring the instant action, and the issues raised are not ripe, as the harm Petitioners allege is merely speculative.

### 1. Political Question Doctrine

The political doctrine question derives from the principle of separation of powers implied by the constitutional grants of power to each co-equal branch of the Commonwealth's government. *Robinson Twp. v. Com. of Pa.*, 83 A.3d 901, 926-27 (Pa. 2013). Under the political question doctrine, courts will refrain from resolving a dispute, and thus reviewing the actions of another branch of government, where review of the action taken "has been entrusted exclusively and finally to the political branches of government for 'self-monitoring.'" *Id.* at 928. The political question doctrine is implicated in matters where "the [C]onstitution has committed the

disputed issue to a coordinate political department[.]" *Id.* at 928. It does not, however, exist to remove a question of law from the judiciary's purview simply because another branch has stated its own opinion on the legal issue involved. *Id.* at 928-29. Courts "will not refrain from resolving a dispute which involves only an interpretation of the laws of the Commonwealth, *for the resolution of such disputes is our constitutional duty*." *Id.* at 928 (emphasis added).

The Pennsylvania Supreme Court "ha[s] been circumspect in [its] application of the political question doctrine." *William Penn Sch. Dist. v. Dep't of Educ.,* 170 A.3d 414, 439 (Pa. 2017). In *William Penn*, our Supreme Court reviewed the justiciability of a claim that the Commonwealth's system of funding public education violated the Education Clause of the Pennsylvania Constitution, which provides that the GA "shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth." Pa. Const. art. III § 14. The Supreme Court held that, to find the issue non-justiciable, there had to be "some indication that vested within the Education Clause mandate is the obligation and prerogative to 'self-monitor.'" *William Penn*, 170 A.3d at 446. That the Education Clause charged the GA with maintaining and supporting "a thorough and efficient system of public education" did not imply that their efforts at doing so would be "graded exclusively by that body without judicial recourse." *Id.* Accordingly, the claims were justiciable.

Respondents note that the GA conferred authority to the Board, with assistance from DOT, to carry out the duties set forth in Act 88. Those duties "solve questions of public policy and public interest (political questions)," which are subject to oversight and review by the GA. Respondents' Br. at 9. Respondents

19

maintain, therefore, that the manner in which Respondents fulfill their duties under Act 88 is nonjusticiable.

We disagree. While Respondents emphasize Act 88's legislative oversight process, they do not address any of the formal criteria that a court must find to apply the political question doctrine, which requires the following:

> there is a textually demonstrable *constitutional* commitment of the disputed issue to a coordinate political department; there is a lack of judicially discoverable and manageable standards for resolving the disputed issue; the issue cannot be decided without an initial policy determination of a kind clearly for non[-]judicial discretion; a court cannot undertake independent resolution without expressing lack of the respect due coordinate branches of government; there is an unusual need for unquestioning adherence to a political decision already made; [or] there is potential for embarrassment from multifarious pronouncements by various departments on one question.

*Robinson Twp.*, 83 A.3d at 928 (emphasis added) (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)). The legal questions here involve statutory construction, not constitutional commitments. Statutory construction is this Court's constitutional duty, and, given Respondents' failure to invoke any of the *Baker* factors, the political question doctrine appears inapposite.

## 2. Standing

For standing, a party must demonstrate that it has a substantial, direct, and immediate interest in the outcome of the litigation. *City of Philadelphia v. Com.*, 838 A.2d 566, 577 (Pa. 2003). A party has a substantial interest in the outcome of litigation if its interest exceeds that of all citizens in procuring obedience to the law. *Id.* The interest is direct if there is a causal connection between the asserted violation and the harm complained of, and the harm is immediate if the causal connection is

20

not remote or speculative. *Id.* Where, as here, a municipality is specially affected by application of a statute, its interest surpasses that of the general public, such that its interest is both substantial and direct. *Id.* As to immediacy, factual claims about present uncertainty due to future harm are remote and speculative and do not confer standing. *Id.* at 578.

Respondents argue that Petitioners lack standing to challenge Respondents' exercise of their duties under Act 88, in part because Act 88 contains no express grant of authority that would permit Petitioners to do so. They maintain that only one remedial mechanism exists for challenging the Board's approval of a transportation project under Act 88 – a concurrent resolution of the GA pursuant to Section 4(c). Once the time period has passed during which the GA may act to rescind a transportation project approved by the Board, oversight of, and responsibility for, the project transfers to DOT. Essentially, Respondents argue that, if the GA declines to exercise its authority to rescind a transportation project approved by the Board, only DOT may thereafter exercise legal authority over any aspect of that project. Respondents also argue that Petitioners lack standing to bring an action on behalf of their citizens. Respondents rely on this Court's decisions in *North Fayette Township v. Commonwealth*, 436 A.2d 243 (Pa. Cmwlth. 1981) and *Snelling v. Department of Transportation*, 366 A.2d 1298 (Pa. Cmwlth. 1976).

Petitioners respond that their status as subordinate government entities does not preclude the instant action, and this Court has upheld the right of such entities to challenge state government actions and laws that impact local government operations. They suggest that Respondents' asserted exclusive jurisdiction over state highways is a red herring, as the regulation and control of *local roadways* does not rest with Respondents. Petitioners reject Respondents' reliance on *North Fayette*

*Township*, as that matter involved the establishment of a temporary detour, the maintenance and responsibility of which fell to DOT. Here, DOT has not suggested that it intends to maintain the local roads that would be impacted by the I-79 Bridge project. These responsibilities will fall on Petitioners. Petitioners reject Respondents' argument that legislation must explicitly confer standing on an entity or individual before an action may be commenced to challenge state action. Such an argument, Petitioners suggest, when taken to its logical conclusion, would permit the GA to eliminate, at will, any judicial review of its legislative acts.

In *North Fayette Township*, the Township of North Fayette (Township) filed a PFR with this Court, seeking to enjoin the Commonwealth, DOT, and the Governor, Richard Thornburgh (collectively, Commonwealth), from rerouting traffic while repairs were made to bridges located in the Township. The Commonwealth filed a preliminary objection challenging the Township's standing to bring the action. The Township's PFR alleged that the planned detour would result in serious safety hazards, as the alternate route lacked the capacity to handle the anticipated volume of traffic and lacked adequate traffic control devices, and the alternate route intersected with several heavily traveled Township roads. The Township based its right to file a claim on Section 702 of the Second Class Township Code,[9] which granted the Township authority to take "all needful means for securing the safety of persons or property within the [T]ownship." *Id.* at 244. In response, the Commonwealth argued that it had a duty to designate detours pursuant to Section

---

[9] Act of May 1, 1933, P.L. 103, *as amended*, added by the Act of August 27, 1963, P.L. 1280, 53 P.S. § 65762.

22

423 of the State Highway Law,[10] and the Township had no standing to challenge its actions.

After applying the basic principles of standing that required the Township to demonstrate its interest in the matter was "substantial, direct[,] or immediate[,]" this Court held that the Township had not demonstrated its interest was substantial, direct, or immediate, as the Township failed to show that the alleged injury affected its ability to carry out its municipal duties, given that DOT had the authority for, and responsibility of, highway safety on alternate routes used as detours. Furthermore, the Township's alleged safety concerns were merely hypothetical in nature, as "nothing [had] happened." *Id.* at 246. While the Township had the power to take actions towards the protection of its citizens, it could not "interfere with a proper governmental function of the Commonwealth in order to do so." *Id.* The Township's belief that a better alternative existed to the proposed detour was not a sufficient basis for challenging the Commonwealth's exercise of statutory authority. *Id.* at 246-47.

*North Fayette Township* is distinguishable from the instant matter. First, the action in *North Fayette Township* was based solely on concerns posed by the Commonwealth's proposed traffic detour. The Township did not allege that the Commonwealth's plans were undertaken in contravention of the State Highway Law. Here, the basis of Petitioners' action is that Respondents approved the Initiative in violation of Act 88 and the P3 Manual. Second, we sustained the Commonwealth's preliminary objections in *North Fayette Township* because the Township failed to show that the harm alleged would affect the Township's ability to perform its municipal functions, and, despite the "dire consequences" the

---

[10] Act of June 1, 1945, P.L. 1242, 36 P.S. §§ 670-423.

23

Township suggested would transpire, "nothing ha[d] happened." *Id.* Instantly, Petitioners base their right to bring their action on the impact the I-79 Bridge project will have on their ability to preserve and protect their local roads, for which DOT will share no responsibility. Finally, the issue in *North Fayette Township* was explicitly limited to "a determination of whether the Township [had] standing to bring [an] action on its own behalf." *Id.* at 243. Our resolution of that matter, therefore, does not control an analysis of Petitioners' standing to bring an action on behalf of its citizens.

Respondents' reliance on *Snelling* is also misplaced, as this Court did not categorically hold that a municipality could not initiate an action on behalf of its citizens. The underlying dispute in *Snelling* involved proposed construction to several roads in the city of Allentown, Pennsylvania (City), and the modification of existing traffic signals. The City alleged that its citizens "may suffer serious bodily harm from auto accidents caused by poor traffic control while traveling in and out of [the City.]" *Snelling*, 366 A.2d at 1301. The City also alleged that its citizens would breathe polluted air caused by increased vehicular emissions. We concluded that such facts were insufficient to confer standing on the City to sue on behalf of its citizens. The other *Snelling* petitioners, merchants that claimed they would suffer financially because customers would be deterred by the proposed construction, also failed to demonstrate they had standing, as the alleged harm was "neither direct nor immediate but, rather, highly speculative at best." *Id.* at 1303.

Instantly, given the potential impact the I-79 Bridge project will have on the roads within Petitioners' borders, Petitioners have sufficiently pled an interest that exceeds that of all citizens in procuring obedience to the law. There is clearly a causal connection between Respondents' asserted violation of Act 88, which

24

resulted in the Initiative's approval, and the harm Petitioners allege will result from the I-79 Bridge project. That harm is neither remote nor speculative, as Petitioners will have to divert resources to accommodate the impact of the I-79 Bridge project and Respondents continue to proceed with the bridge projects identified by DOT pursuant to the Initiative, which was itself developed and approved, allegedly in violation of Act 88. For these reasons, we reject Respondents' argument that Petitioners lack standing to pursue the instant action.

### 3. Ripeness

The issues of standing and ripeness "considerabl[y] overlap, . . . especially where the contentions regarding lack of justiciability are focused on arguments that the interest asserted by the petitioner is speculative, not concrete, or would require the [C]ourt to offer an advisory opinion." *Robinson Twp.*, 83 A.3d at 917. Ripeness is distinct from standing insofar as it reflects a separate concern that the relevant facts have been insufficiently developed to permit judicial resolution of the dispute. *Id.* "In deciding whether the doctrine of ripeness bars consideration of a declaratory judgment action, we consider 'whether the issues are adequately developed for judicial review and what hardship the parties will suffer if review is delayed.' " *Pa. Indep. Oil & Gas Ass'n* v. *Dep't of Env't Prot.*, 135 A.3d 1118, 1127-28 (Pa. Cmwlth. 2015) (internal citations omitted).

Respondents argue that Petitioners' claims are not ripe, as the alleged harms will only occur if, and when, the I-79 Bridge is tolled.[11] As construction will not commence for several years, and no toll has been assessed, Respondents contend that Petitioners have not suffered from any of the impacts set forth in their PFR.

---

[11] Curiously, Respondents dismiss the I-79 Bridge project as "imaginary[,]" despite identifying the I-79 Bridge as one of the candidate bridges in its February 18, 2021 press release. PFR, Ex. 7.

25

Respondents note that opportunities remain for Petitioners and their citizens to voice their concerns about the final scope of the I-79 Bridge project, which ultimately may not commence.

While Petitioners acknowledge that any impact to traffic caused by the I-79 Bridge project will not arise until tolling is imposed, and that may not occur for some time, they maintain that the alleged harm is not merely speculative, but immediate, as Petitioners must act now to ensure resources are available to address the expected impact – resources that will necessarily have to be diverted from other municipal projects and programs. Petitioners further argue that Respondents were statutorily required to identify the proposed transportation project, consult with affected persons, and evaluate whether the proposed project was in the best interests of the Commonwealth prior to approval by the Board. Despite failing to comply with these prerequisites, Respondents continue to move forward with the Initiative, including the I-79 Bridge project. Petitioners submit that Respondents' arguments fail to consider that Petitioners have challenged the process by which Respondents approved the Initiative. Respondents' post-hoc efforts cannot rectify their past failure to comply with Act 88, which mandated that Respondents consult with Petitioners before they presented the Initiative to the Board for approval.

We agree that Petitioners' claims relating to traffic impacts that will result from tolling are speculative. *The alleged deprivation of Petitioners' procedural interests under Act 88 is not speculative, however, as it already occurred and continues to occur.* We conclude that the deprivation is sufficiently immediate to confer standing. *See City of Philadelphia*, 838 A.2d at 578. "[I]nsofar as ripeness . . . reflects the separate concern that relevant facts are not sufficiently developed to permit judicial resolution of the dispute," *Robinson Twp.*, 83 A.3d at 917, that

26

concern is not present here. Petitioners allege a violation of Act 88, which principally presents a legal question, and no additional factual development in another proceeding is forthcoming. *See id.*

Based on the foregoing, we conclude that Petitioners' claims are justiciable.

## C. Declaratory Judgment

### 1. Violations of Act 88

Having concluded that Petitioners' claims are justiciable, we turn to the merits of those claims. First, Petitioners argue that the Initiative is void *ab initio* because it was approved in violation of Act 88.

Petitioners note that the relevant provisions of Act 88 use the word "shall," which Pennsylvania courts have held denotes a mandatory duty. Section 4(a) of Act 88 relevantly specifies that the Board "shall" do the following: (1) adopt guidelines establishing the procedures for submitting a proposed transportation project; (2) consult with persons[12] affected by proposed transportation projects; and (3) evaluate and, if the Board finds that the proposed transportation project is in the Commonwealth's best interest, approve the proposed transportation project by adopting a resolution. 74 Pa.C.S. § 9104(a). Section 5(b) of Act 88 provides that DOT "shall" develop a detailed analysis of a proposed transportation request or recommendation prior to the Board's approval. 74 Pa.C.S. § 9105(b). These statutory provisions, which do not permit the exercise of discretion by the Board, are contrasted by Section 9104(c), which states that the GA "may" rescind the Board's adoption of a resolution, should it choose to do so. 74 Pa.C.S. § 9104(c).

---

[12] Act 88 does not define the term "persons." Per Section 1991 of the Statutory Construction Act of 1972, the term includes government entities such as Petitioners. 1 Pa.C.S. § 1991.

27

In furtherance of its duty under Section 4(a)(2) of Act 88, the Board adopted the Manual, which devised a two-part process for identifying and screening proposed transportation projects. DOT's Candidate Project Form, which initiates the screening process, requires that an applicant, such as DOT, set forth the location, estimated costs, impacted jurisdictions, and rationale for requesting the P3 model of project delivery. Petitioners argue that this requirement inherently necessitates identification of a specific transportation project to facilitate the screening process.

Petitioners assert that neither the Board nor DOT fulfilled its duties under Act 88 or the P3 Manual. Instead, the Board adopted the Initiative, a blanket proposal that included every bridge in the Commonwealth. The I-79 Bridge project was not included as part of the Initiative until several months after the Board approved the Resolution and DOT, not the Board, took responsibility for selecting the I-79 Bridge as a candidate for replacement under the Initiative. Petitioners argue that such an after-the-fact procedure contravenes Act 88's clear mandates. As a result, they maintain that the I-79 Bridge project is not an approved transportation project as contemplated by Act 88.

Petitioners also argue that Respondents failed to comply with Section 4(a)(3) of the Act, which directs the Board to consult with persons affected by proposed transportation projects. Given that Section 4(a)(3) expressly applies to proposed, not approved, projects, Petitioners suggest that the Board must know and understand where a project will be located if it is to consult with the affected population. Instantly, the Board failed to consult with Petitioners, or even provide notice that the I-79 Bridge was a potential candidate for tolling, prior to approving the Initiative. Additionally, without more information as to the location of a specific transportation project, Respondents could not properly evaluate whether the Initiative was in the

28

best interests of the Commonwealth, as required by Section 4(a)(4) of Act 88. Act 88 does not authorize the Board to delegate these duties to DOT. Despite this, the sweeping nature of the Initiative would permit DOT to designate additional candidate bridges at will, without Board or GA intervention or oversight.

Finally, Petitioners suggest that the Resolution adopted by the Board, which included all Commonwealth bridges within the Initiative's sweep, frustrated the legislative oversight contained in Section 4(c) of Act 88, as it provided no details that would allow the GA to evaluate whether the Initiative was in the best interests of the Commonwealth, let alone a specific legislative district. As drafted, the Resolution, and the Initiative, completely evade any meaningful legislative review.

Respondents deny that they failed to comply with Act 88. DOT's White Paper, for example, summarized the analysis DOT performed in developing the Initiative. Regarding the Manual, Respondents note that it is intended to be flexible to meet the particular needs of a given project. Respondents also dispute Petitioners' interpretation of Section 4 of Act 88, as it does not expressly require that the Board fulfill each duty prior to approving a transportation project. They contend that DOT is the most important entity with which the Board must consult, as it is the "facility owner of the Commonwealth's interstate highway system." Respondent's Reply Br. at 17. Respondents suggest that DOT's summarization of the Initiative constitutes "adequate consultation for a statewide project under" Act 88. *Id.* at 18. Moreover, as specific bridge projects are identified and finalized, DOT will engage in "extensive public participation and consultation[.]" *Id.*

Having reviewed the relevant statutory authority, and the P3 Manual adopted by DOT, we agree with Petitioners that Respondents failed to comply with the duties set forth therein. It is clear, and Respondents have not denied, that the Board had no

29

specific bridges in mind when it approved the Initiative in November 2020. There is no indication that the Board engaged in any meaningful consultation with "persons affected" by the Initiative, as Act 88 requires. Act 88 plainly requires this consultation to precede approval: the Board's duty is to consult with those affected by "*proposed*" transportation projects, not projects already approved. 74 Pa.C.S. § 9105. The P3 Manual reaffirms that consultation is part of the approval process, not an afterthought. Thus, Respondents' claims that public meetings and consultation held after approval of the Initiative are irrelevant to the Board's fulfillment of its duty to consult affected persons. Tellingly, DOT's form for initiating project screening requires the public entity to provide information on "impacted jurisdictions." *See* P3 Manual at 16; PFR Ex. 3. It is not clear how DOT could have provided this information—given the breadth of the Initiative, DOT would need to list either all municipalities in the Commonwealth or none of them. Neither approach allows for meaningful consultation with affected persons before approval, which, as DOT's form recognizes, is what Act 88 intends. Respondents do not dispute that the I-79 Bridge project, which was identified as being part of the Initiative only after approval, will affect Petitioners.

Based on the record before us, we are compelled to conclude that the Board did not consult with affected persons before approving the Initiative. Instead, DOT purported to do so afterward once specific bridges were announced. This is inconsistent with Act 88's procedural framework, both as shown by the statute's text and as understood by the Board in its P3 Manual.

Furthermore, the relevant provisions of Act 88 make it clear that the Board may not approve so general a resolution that the Board cannot comply with its other duties under the Act. To be meaningful, these duties require a modicum of

30

specificity in a proposed project. Petitioners have credibly shown that the Initiative lacks sufficient specificity, such that the Board cannot have performed, and indeed did not perform, all of its essential duties in approving the Initiative.

## 2. Non-delegation Clause

It is well-settled that the GA may not delegate its power to legislate. *Com. v. Cherney*, 312 A.2d 38, 40 (Pa. 1973). Article II, section 1 of the Pennsylvania Constitution provides that the Commonwealth's legislative power "shall be vested in a [GA], which shall consist of a Senate and a House of Representatives." Pa. Const. art. II, § 1.

While the GA may not delegate its legislative authority, it may vest an administrative agency with the authority and discretion to execute and administer a law. *Pa. Builders Ass'n v. Dep't of Lab. & Indus.*, 4 A.3d 215, 223 (Pa. Cmwlth. 2010). When the GA vests an administrative agency with the power to act, Pennsylvania jurisprudence still requires that the legislature make the basic policy choices involved. *Phantom Fireworks Showrooms, LLC v. Wolf*, 198 A.3d 1205, 1227 (Pa. 2018). This constraint serves the dual purpose of ensuring that "duly authorized and politically responsible officials" have made the necessary policy decisions, thus protecting against the arbitrary exercise of unnecessary and uncontrolled discretionary power. *Id.* (internal citations omitted). The legislation must include adequate standards that guide and restrain the exercise of any delegated administrative functions as well as concrete measures to channel the exercise of discretion and safeguards to protect against arbitrary and ad hoc decision making. *Id.* Such safeguards include a requirement that a delegatee hold hearings, allow for public notice and comment, or explain the grounds for its decision in a reasoned opinion that is subject to judicial review. *Id.*

31

Petitioners have not asserted that Act 88 itself violates the non-delegation clause; rather, the constitutional infirmity lies in the manner in which the Board carried out its duties. In that vein, Petitioners argue that the Board impermissibly delegated its policymaking duties to DOT when it approved the Initiative and thereafter granted DOT the authority to select the candidate bridges. Petitioners contend that such actions frustrate the legislative intent in Act 88 that transportation projects be identified, screened, and evaluated by the Board prior to their approval, thus violating the non-delegation doctrine established in article II, section 1 of the Pennsylvania Constitution.

Respondents maintain that the Board appropriately exercised its authority in approving the Initiative and then relying on DOT to assist in determining which bridges would be subject to repair or replacement. Respondents further suggest that the Board had no policy making authority to delegate, as the GA retained the ability to rescind the Board's action by means of a concurrent resolution.

Although Petitioners have not questioned the constitutionality of Act 88, it bears noting that Act 88 does not appear to contain the necessary safeguards on the Board's exercise of discretion. In evaluating other delegating statutes, our courts have looked to legislative findings or policy statements in the statute that form such limits; however, Act 88 does not appear to contain such statements. *Cf. Indep. Sch. Dist.*, 260 A.3d 925, 939 (Pa. 2021) (holding the statute "comprehensively sets forth the General Assembly's policy decisions"). To the extent the General Assembly made any "basic policy choice," it is not clear where that choice is embodied in Act 88, and thus how it could be applied by the Board. Section 10(f) of Act 88,[13] for

---

[13] Section 10(f) of Act 88 provides:

**(Footnote continued on next page…)**

32

example, which relevantly permits the inclusion of "user fees," or tolling, in a P3 agreement, does not meaningfully restrain the policy decisions of the Board—it simply provides a list of required contractual terms *if* the Board chooses to impose a toll, but gives no guidance on *whether* the Board should do so. Section 4(a)(2) mandates that the Board adopt guidelines establishing the procedure for submitting a transportation project request but otherwise provides no guidance. Although the Board presumably adopted the P3 Manual as a means of complying with Section 4(a)(2), Section 1.1 of the P3 Manual essentially renders its provisions discretionary, as "certain elements . . . may not apply in all circumstances and may be subject to change as deemed appropriate by the Board . . . ." PFR, Ex. 1. The safeguard

---

**(f) User fees.--**A provision establishing whether user fees will be imposed for use of the Public-Private transportation project and the basis by which any user fees will be imposed and collected shall be determined in the Public-Private transportation partnership agreement. If a user fee is proposed as part of the Public-Private transportation project, a proprietary public entity shall include provisions in the agreement that authorize the collection of user fees, tolls, fares or similar charges, including provisions that:

> (1) Specify technology to be used in the Public-Private transportation project.
> (2) Establish circumstances under which the proprietary public entity may receive a share of revenues from the charges.
> (3) Govern the enforcement of electronic tolls, including provisions for use of available technology.
> (4) Establish payment collection standards, including provisions for enforcement of nonpayment and penalties.
> (5) In the event an operator of a vehicle fails to pay the prescribed toll or user fee at any location on a Public-Private transportation project where tolls or user fees are collected by means of an electronic or other automated or remote form of collection, the collection provisions of section 8117 (relating to electronic toll collection) shall apply except that the development entity shall possess all of the rights, roles, limitations and responsibilities of the Pennsylvania Turnpike Commission.

74 Pa.C.S. § 9110.

contained in Section 4(a)(3) of Act 88, relating to Board consultation with affected persons, has essentially been nullified by the Board's interpretation that it need not consult with anyone, other than perhaps the property owner, prior to approving a transportation project. *Moreover, contrary to sound delegation principles recognized by our courts, Act 88 expressly insulates the Board's decisions from judicial review*. *See* 74 Pa.C.S. § 9104(b).

In addition to these serious questions of law,[14] the record before us greatly heightens this Court's delegation concerns. The Board essentially approved a multi-billion-dollar transportation project based on what was essentially a four-page powerpoint recommendation from DOT that failed to delineate which, or how many, pieces of public infrastructure the Initiative would affect. Given these concerns, we strongly question the constitutional viability of Act 88. However, as other grounds exist for disposing of the instant matter, we will not further address the constitutionality of Act 88. *Dep't of Transp. v. McCafferty*, 758 A.2d 1155, 1159 (Pa. 2000) (court will not address the constitutionality of an act of the legislature if there are other grounds for disposing of the issue).

Ultimately, the language of Act 88 is clear—the General Assembly delegated its policymaking authority to the Board. Section 4(a) of Act 88 tasks the Board, not DOT, with determining whether a project is in the "best interests of the Commonwealth[.]" 74 Pa.C.S. §9104(a). While Section 5(a) of Act 88 directs that DOT "shall . . . assist the [B]oard in carrying out its duties and responsibility," 74 Pa.C.S. § 9105(a), it does not direct that DOT carry out those duties on its own.

---

[14] We reject Respondents' contention that the GA intended to retain its policymaking duties in Act 88, as Section 4(b) expressly provides that "[a]ctions by the [B]oard are a **determination of public policy** and public interest . . . ." 74 Pa.C.S. § 9104(b) (emphasis added).

## III.    Conclusion

For the above reasons, we grant Petitioners' application for summary relief to the extent it seeks a declaration that the Initiative is void *ab initio*, having been approved in violation of Act 88's provisions and the guidelines set forth in the P3 Manual.    Having concluded that the Initiative is void, we need not address Petitioners' request for injunctive relief.    Accordingly, we deny the application for summary relief filed by Respondents.    Given our disposition on the parties' applications for summary relief, Respondents' preliminary objections are dismissed as moot.[15]

_____
ELLEN CEISLER, Judge

Judge Fizzano Cannon did not participate in the decision of this case.

---

[15] Respondents' preliminary objections present the same arguments raised herein, with the exception of their preliminary objection to Petitioners' request for a preliminary injunction, which Petitioners withdrew following the January 6, 2022 status conference.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

South Fayette Township, Bridgeville : 
Borough, and Collier Township, : 
                Petitioners : 
                 : 
                 : 
        v. : No. 404 M.D. 2021
                 : 
Pennsylvania Department of : 
Transportation, Public-Private : 
Transportation Partnership Board : 
(P3 Board) and Yassmin Gramian, : 
P.E., in their official capacity as : 
Chairperson of the P3 Board, : 
                Respondents : 

# **O R D E R**

AND NOW, this 30th day of June, 2022, upon consideration of the application for summary relief filed by South Fayette Township, Bridgeville Borough, and Collier Township, (collectively, Petitioners), we hereby declare that the Major Bridge P3 Initiative is void *ab initio*. Accordingly, we deny Petitioners' request for permanent injunctive relief. The application for summary relief filed by the Pennsylvania Department of Transportation, the Public-Private Transportation Partnership Board (P3 Board) and Yassmin Gramian, P.E., (collectively, Respondents) is hereby denied. Respondents' preliminary objections are dismissed as moot.

_____
ELLEN CEISLER, Judge